WRIGHT, FINLAY & ZAK, LLP
Edgar C. Smith, Esq.
Nevada Bar No. 5506
Christopher Alan James Swift, Esq.
Nevada Bar No. 11291
7785 W. Sahara Avenue, Suite 200
Las Vegas, Nevada 89117
(702) 666-0632; Fax: (702) 946-1345
cswift@wrightlegal.net
*Attorneys for Ocwen Loan Servicing, LLC*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| IN RE: | Case No.: 13-50461-BTB |
| CHRISTOPHER MICHAEL MARINO, and VALERIE MARGARET MARINO, | Chapter 7 |
| Debtors | **MOTION TO STAY EXECUTION OF JUDGMENT PENDING APPEAL** |

COMES NOW secured creditor OCWEN LOAN SERVICING, LLC ("Ocwen") and submits its Motion to Stay the Execution of the July 5, 2016, Order Regarding Motion to Reopen Chapter 7 Under 11 U.S.C. §§350 and F.R.B.P. 5010 and Hold Creditor, Ocwen Loan Servicing LLC in Contempt and for Sanctions for Violation of the Discharge Injunction 11 U.S.C. §524(a)(2) [Docket No. 60] (hereafter "Order").

/././
/././
/././
/././
/././

1

1  This Motion is based on the pleadings and papers on file with this Court, any facts
2  subject to judicial notice, any argument this Court might consider, and any evidence this Court
3  might entertain.

4  Dated: October 24, 2016                     WRIGHT, FINLAY & ZAK, LLP

/s/ *Christopher A.J. Swift, Esq.*
Edgar C. Smith, Esq.
Nevada Bar No. 5506
Christopher Alan James Swift, Esq.
Nevada Bar No. 11291
7785 W. Sahara Avenue, Suite 200
Las Vegas, Nevada 89117
(702) 666-0632; Fax: (702) 946-1345
cswift@wrightlegal.net
*Attorneys for Ocwen Loan Servicing, LLC*

## I. INTRODUCTION

This Court entered its Order on July 5, 2016, directing Ocwen to pay Debtors $119,000.00 on purported violations of the discharge injunction as well as attorney fees and costs in a yet to be determined amount. On July 20, 2016, Ocwen filed a Motion for Reconsideration [Docket No. 67] of the Order, which is set to be heard on September 7, 2016. Further, on July 20, 2016, Ocwen appealed the Order to the Ninth Circuit Bankruptcy Appellate Panel [Docket No. 68]. On August 2, 2016, the Debtors filed their own cross-appeal [Docket No. 83]. Due to the pending appeals, Ocwen respectfully requests that this court stay the execution of the Order and award of attorney fees and costs.

## II. LEGAL STANDARD

Federal Rule of Bankruptcy Procedure ("FRBP") 8007(a)(1) permits a party to move for "a stay of a judgment, order, or decree of the bankruptcy court pending appeal." The motion may be made "either before or after the notice of appeal is filed." FRBP 8007(a)(2). To obtain a stay pending an appeal, a party must show: (1) that the movant is likely to prevail on the merits of its appeal; (2) without a stay, the movant will suffer irreparable injury; (3) other interested persons will suffer no substantial harm; and (4) the public interest will not be harmed. In re

Irwin, 839, 844 (E.D. Cal. 2006) (citing to In re Blackwell, 162 B.R. 117, 119 (E.D. Pa. 1993).

### III. LEGAL ARGUMENT

**A.    OCWEN IS LIKELY TO PREVAIL ON THE MERITS OF THE APPEAL**

Respectfully, Ocwen believes that it will prevail on the appeal.

First, 11 USC § 524 does not specifically authorize any remedy for violation of the discharge injunction provisions in that statute. The remedy is found under the court's contempt powers in 11 USC § 105(a). Generally, the lender must have knowledge of the discharge injunction and intended the actions that violated the discharge injunction.

Ocwen submits Debtors' case is deficient in the latter element for at least a portion of the damages awarded by the court. Ocwen retained the right to foreclose, and activities related to foreclosure cannot be construed as violating the discharge injunction.

Debtors failed to present clear and convincing evidence that Ocwen was attempting to collect a discharged debt after entry of the discharge order. There was no competent evidence in the record that supports the finding that Ocwen made 100 telephone calls – after entry of the discharge order – *to collect a discharged debt*, let alone evidence that meets the "clear and convincing" standard of proof that is required to warrant sanctions and damages. ZiLOG, Inc. v. Corning (In re ZiLOG, Inc.), 450 F.3d 996, 1007 (9th Cir. 2006).

The discharge injunction does not prohibit Ocwen's right, post-discharge, to foreclose on its deed of trust. *See,* Dewsnup v. Timm, 504 U.S. 410, 417-18 (1992). "[I]n cases where the creditor holds a secured interest in property subject to a scheduled debt, a discharge extinguishes only the personal liability of the debtor. 'Notwithstanding the discharge, the [secured creditor's] right to proceed against [the debtor] in rem survived the Chapter 7 liquidation." In re Garske, 287 B.R. 537, 542 (B.A.P. 9th Cir. 2002) quoting Johnson v Home State Bank, 501 U.S. 78, 84-85 (1991).

Ocwen may also send to Debtors any notices required by state law. *Id.* The discharge injunction does not preclude contact with the Debtors where the purpose is to provide Debtors with information about Ocwen's right to foreclose, notices of foreclosure, and alternatives to it

for the Debtors to consider. Exhibits "A" through "W" contain suitable and prominent disclaimers, and most of this correspondence was required by state or federal law to be sent to the Debtors. Debtors failed to present clear and convincing evidence that Ocwen communicated in each case in such a manner as to leave no doubt that Ocwen was attempting to collect a discharged debt and therefore to violate the discharge injunction. Nor was their proof of any other activity that would corroborate the claim, such as soliciting reaffirmation of the debt, pressuring the Debtors to sign a new note, contacting their employer, commencing suit, or threatening such legal action against them.

Likewise, there was insufficient evidence to demonstrate that the Debtors suffered actual damages. Survival of *in rem* rights [post-discharge] means that a creditor will have an ongoing business relationship with the debtor. Therefore, "some contacts are necessary and proper for maintaining the debtor-creditor relationship with regard to the surviving lien." In re Bandy, Bankr. No. 03-00753, 2003 WL 21781995 at *2 (Bankr. N.D. Iowa, July 29, 2003) (*citing In re Garske*, 287 B.R. at 545). "The juxtaposition of the continued existence of a lien, but with no corresponding personal liability for a debtor, creates an awkward situation wherein a creditor may legitimately possess a reason to communicate with a debtor in the post-discharge period." Mooney v. Green Tree Servicing, LLC (In re Mooney), 340 B.R. 341, 358 (Bankr. E.D. Tex. 2006).

Ocwen respectfully submits the foregoing sanction order constitutes an abuse of discretion because there was no effort on the Debtors' part to identify, with particularity, the substance of the communications with Ocwen. "A bankruptcy court abuses its discretion if its decision is based on an incorrect legal rule, or its findings of fact were illogical, implausible, or without support in the record." Chionis v. Starkus (In re Chionis), 2013 Bankr. LEXIS 5426 at *11 (U.S. B.A.P. 9th Cir. Dec. 2013).

Only those actual damages, including attorney's fees, incurred as a result of the noncompliant conduct can be recovered as part of a compensatory civil contempt sanctions award. Rosales v. Wallace (In re Wallace), 2012 Bankr. LEXIS 2934, 2012 WL 2401871, *8

4

Since there is no support in the record to demonstrate that Ocwen made 100 telephone calls post-discharge and that the Debtors suffered actual damage, Ocwen will likely prevail on the merits of its appeal. Further, the correspondence sent by Ocwen to the Debtors was mandated by Federal and Nevada law and thus not a basis for a finding that Ocwen violated the bankruptcy's discharge injunction.

**1.     There was no competent evidence to demonstrate that Ocwen made 100 telephone calls.**

Debtors' briefing prior to the February 25th and 26th evidentiary hearing do not, in any manner whatsoever, allege that Ocwen made any telephone calls to Debtors' post discharge. See Docket No. 27, 27-1, and 40.

Although not raised in the moving papers, Mrs. Marino, the last witness called, takes the stand and proceeds to testify as follows:

> Q [Christopher Burke, Esq.]: Okay.  I don't want to go – it sounds like you got anywhere from 60 to 100 calls.  Does that sound --
>
> A [Valerie Marino]: It was a lot of calls, yes.

See pertinent excerpts of transcript of evidentiary hearing, a true and correct copy attached hereto as **Exhibit A**.

The foregoing testimony was elicited through counsel coaching the witness.  More charitably, it may be construed as a suggestion posed by the debtor's counsel and a vague affirmation by the Debtor to counsel's suggestion.  It is not competent evidence because it lacks a proper foundation and was therefore inadmissible.  The court should not have given it any weight.

Moreover, Ocwen's telephone records actually indicate that there were, in fact, 35 telephone calls made post-discharge. See Affidavit in Support of Motion for Reconsideration of Order Regarding Motion to Reopen Chapter 7 Under 11 U.S.C. §350 and F.R.B.P. 5010 and Hold Creditor, Ocwen Loan Servicing, LLC, in Contempt and for Sanctions in Violation of the Discharge Injunction 11 U.SC. §524(a)(2), a true and correct copy attached hereto as **Exhibit B**.

5

Even if every one of those calls was a violation, (and there is no evidence to suggest that the phone calls were made to collect a debt) it is only 1/3 of the estimated amount coached from the witness, so that the "100 calls" had no place in any findings of fact.

**2.     The Debtors did not prove actual damages.**

An aggrieved debtor may recover compensatory damages for violation of the discharge injunction. Walls v. Wells Fargo Bank, N.A., 276 F. 3d 502, 507 (9th Cir. 2002). A court may award emotional distress damages as an element of compensatory civil contempt sanctions award. Dawson v. Washington Mutual Bank (In re Dawson), 390 F.3d 1139, 1148 (9th Cir. 2004). However, the party seeking such an award must prove the following: (1) they suffered significant harm; (2) the significant harm must be clearly established: and (3) a causal connection between the significant harm and the violation. *Id*. at 1149.

In the instant matter, Debtors provided self-serving statements that they suffered marital discord due to their financial strains. Ms. Marino contended that she suffered "stomach issues" due to their financial strain. Mr. Marino contended he was angry due to their financial strain and his anger created marital issues. Financial strains lead to bankruptcy, and for most, the stigma of bankruptcy elicits uncomfortable feelings including shame and anger. This is compounded where, as here, the Debtors also stand to lose their residence to the lender to whom they stand in default. This is not attributable to sanctionable conduct by Ocwen. Debtors made no effort to distinguish the discomfort, frustration and anger over filing bankruptcy, losing their home after filing bankruptcy, and the discomfort they claim to have been nflicted upon them by Ocwen. There was no explanation offered, for example, as to why the Marinos felt that Ocwen's actions inflicted unique, or even additional, distress upon them.

When the record is viewed in its totality, the connection between this marital discord and anger and the specific actions of Ocwen is tenuous at best. There was no causal relationship established between the "cause" and "effect" with particularity sufficient to support the conclusion that Debtors sustained damages by Ocwen's activities.

The record is replete with the Marinos failure to establish this causal connection and the

1 contention did not hold up on cross-examination:

2     Q:     [Sean Payne, Esq.]: Mrs. Marino, you stated that all of the stress related to losing
3 your property caused you to have some stomach issues and various other issues, fighting with
4 your husband and so forth.  Is that correct?

5     A.     [Mrs. Marino]: Correct.

6     Q.     And you mentioned in your testimony that they started back when you were
7 trying to modify the loan.  Is that correct?

8     A.     Uh-huh.

9     Q.     And you also – is it correct that you moved out of the Property roughly in the
10 summer of 2011?

11     A.     Correct.

12     Q.     So is it fair to say that you were attempting to modify your loan prior to moving
13 out of the property?

14     A.     Correct.

15     Q.     Is it fair to say that the stomach problems began back in summer 2011 at the
16 latest?

17     A.     Yeah.  It would be fair to say that.[1]

18 See pertinent excerpts of transcript of evidentiary hearing, a true and correct copy attached
19 hereto as **Exhibit A**.  The onset of the Debtor's symptoms, then, were connected to the effort to
20 save their home, a plausible and reasonable connection.  It follows that if symptoms pre-ceded
21 the discharge, it cannot be assumed that, post-discharge, the symptoms were attributable to any
22 other causes.

23     **3.**     **The correspondence sent by Ocwen did not violate the discharge injunction.**

24 Even if a debtor discharges a debt through bankruptcy, a lender is still permitted to send
25 that debtor correspondence. Ramirez v. GMAC (In re Ramirez), 280 B.R. 252, 622-624 (Bankr.

---

[1]     The discharge injunction was entered on June 18, 2013, Docket No. 20.

7

C.D. Cal. 2002); In re Garske, 287 B.R. 537, 543 (9th Cir. BAP 2002); In re Lemieux, 520 B.R. 361, 366 (Bankr. D. Mass. 2014); In re Nordlund, 494 B.R. 507, 516-517 (Bankr. E.D. Cal. 2011); Mele v. Bank of Am. Home Loans, 486 B.R. 546, 557-558 (Bankr. N.D. Ga. 2013) (holding that fifteen pieces of correspondence to debtor, including information correspondence, correspondence regarding the FHA status of the loan, responses, and statements, were not violations of the discharge order.)  The correspondence sent by Ocwen to the Debtors contained disclaimers clearly indicating that Ocwen was not proceeding against the Debtors.  In fact, the correspondence sent to the Debtors was actually required by law, as briefed extensively with this Court.  See Docket No. 38 and 46.  Ocwen will not reiterate those arguments here, but if this Court would like briefing on these arguments, Ocwen would welcome the opportunity to provide additional briefing.

### B. OCWEN WILL SUFFER IRREPARABLE INJURY IF NO STAY OF THE JUDGMENT IS PROVIDED

If this Court were to refuse to stay the judgment pending the appeal, Ocwen would suffer irreparable harm.  This Court Ordered Ocwen to pay $119,000.00 to the Debtors.  While money is not typically considered to be "irreparable injury," Ocwen will likely not be able to recoup this money if it were successful on the appeal, and recovery of the judgment will effectively moot the appeal.

Furthermore, this Court's holding that Ocwen violated the discharge order by sending correspondence to the Debtors in a form that Ocwen believes must be sent chills Ocwen's ability to communicate with all of its borrowers in bankruptcy in this judicial district, impairing Ocwen's responsibilities as a loan servicer.

### C. A STAY WOULD NOT HARM THE DEBTORS

Debtors cannot reasonably claim that they would be harmed if this Court were to stay execution of its Order.  Under this Court's Order, Debtors are only entitled to receive the $119,000.00, an amount that represents a sanction and funds that are not earmarked for the any purpose. Postponing the award would not harm the Debtors in any meaningful way, other than

that they will not be able to spend the money until a final determination is made. Indeed, Debtors have filed their own cross-appeal in this matter and thus seek also seek appellate relief.

### D. THE PUBLIC INTEREST WOULD NOT BE HARMED BY A STAY

The public interest would be harmed if a sanction award is postponed until final resolution of the appeal. The issue on appeal, whether Ocwen violated the discharge injunction and whether the Court abused its discretion in awarding a disproportionally large amount in light of the Debtors' lack of evidence of actual harm, is not an appeal concerning the public interest, only Debtors. Staying Debtors ability to receive the sanction award does not harm the public interest.

### IV. CONCLUSION

For the aforementioned reasons, Ocwen respectfully asks that this Court say any award pending the current appeal.

Dated: October 24, 2016                    WRIGHT, FINLAY & ZAK, LLP

/s/ *Christopher A.J. Swift, Esq.*
Edgar C. Smith, Esq.
Nevada Bar No. 5506
Christopher Alan James Swift, Esq.
Nevada Bar No. 11291
7785 W. Sahara Avenue, Suite 200
Las Vegas, Nevada 89117
(702) 666-0632; Fax: (702) 946-1345
cswift@wrightlegal.net
*Attorneys for Ocwen Loan Servicing, LLC*

9

# CERTIFICATE OF SERVICE

1. On October 24, 2016, I served the following document(s):

   **MOTION TO STAY EXECUTION OF JUDGMENT PENDING APPEAL**

2. I served the above-named document(s) by the following means to the persons as listed below:

   (Check all that apply)

   ■ a. ECF System (You must attach the "Notice of Electronic Filing", or list all persons and address and attach additional paper if necessary)

   SETH J. ADAMS on behalf of Creditor DEUTSCHE BANK NATIONAL TRUST COMPANY, AS TRUSTEE FOR GMACM MORTGAGE LOAN TRUST
   sadams@woodburnandwedge.com, NVBK@mccarthyholthus.com

   CHRISTOPHER PATRICK BURKE on behalf of Debtor CHRISTOPHER MICHAEL MARINO
   attycburke@charter.net

   CHRISTOPHER PATRICK BURKE on behalf of Joint Debtor VALERIE MARGARET MARINO
   attycburke@charter.net

   W. DONALD GIESEKE
   wdg@renotrustee.com, dgieseke@ecf.epiqsystems.com

   U.S. TRUSTEE - RN - 7
   USTPRegion17.RE.ECF@usdoj.gov

   ■ b. United States mail, postage fully pre-paid (List persons and addresses. Attach additional paper if necessary)

   CHRISTOPHER MICHAEL MARINO
   POB 565
   VERDI, NV 89439

   VALERIE MARGARET MARINO
   POB 565
   VERDI, NV 89439

☐ c.  **Personal Service** (List persons and addresses.  Attach additional paper if necessary)

I personally delivered the document(s) to the persons at these addresses:

_____

☐    For a party represented by an attorney, delivery was made by handing the document(s) to the attorney or by leaving the document(s) at the attorney's office with a clerk or other person in charge, or if no one is in charge by leaving the document(s) in a conspicuous place in the office.

☐    For a party, delivery was made by handing the document(s) to the party or by leaving the document(s) at the person's dwelling house or usual place of abode with someone of suitable age and discretion residing there.

☐ d.  **By direct email** (as opposed to through the ECF System) (List persons and email addresses.  Attach additional paper if necessary)

Based upon the written agreement of the parties to accept service by email or a court order, I caused the document(s) to be sent to the persons at the email addresses listed below.  I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

☐ e.  **By fax transmission** (List persons and fax numbers.  Attach additional paper if necessary)

Based upon the written agreement of the parties to accept service by fax transmission or a court order, I faxed the document(s) to the persons at the fax numbers listed below.  No error was reported by the fax machine that I used.   A copy of the record of the fax transmission is attached.

☐ f.  **By messenger** (List persons and addresses.  Attached additional paper if necessary)

I served the document(s) by placing them in an envelope or package addressed to the persons at the addresses listed below and providing them to a messenger for service.  (A declaration by the messenger must be attached to the Certificate of Service).

I declare under penalty of perjury that the foregoing is true and correct.

Signed on Monday, October 24, 2016.

*/s/   Faith Harris*_____
An employee of Wright, Finlay & Zak, LLP

11

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEVADA (RENO)

IN RE:

CHRISTOPHER MICHAEL MARINO
and VALERIE MARGARET MARINO,

        Debtors.

Case No. 13-50461-BTB

Chapter 7

300 Booth Street
Reno, NV 89509

Thursday, February 25, 2016
10:05 a.m.

TRANSCRIPT OF EVIDENTIARY HEARING RE: DOC# 27 MOTION TO REOPEN
CHAPTER 7 CASE UNDER 11 U.S.C. 350 AND F.R.B.P. 5010 TO HOLD
CREDITORS IN CONTEMPT AND FOR SANCTIONS FOR VIOLATION OF THE
DISCHARGE INJUNCTION 11 U.S.C. 524(A)(2). FEE AMOUNT 260.,
MOTION FOR CONTEMPT, MOTION FOR SANCTIONS FOR VIOLATION OF THE
DISCHARGE INJUNCTION FILED BY CHRISTOPHER PATRICK BURKE ON
BEHALF OF CHRISTOPHER MICHAEL MARINO, VALERIE MARGARET MARINO
BEFORE THE HONORABLE BRUCE T. BEESLEY
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtors:  CHRISTOPHER PATRICK BURKE, ESQ.
                    702 Plumas Street
                    Reno, NV 89509
                    (775) 333-9277

For Ocwen Loan
Servicing, LLC:  Wright, Finlay & Zak
                    By: SEAN N. PAYNE, ESQ.
                    7785 West Sahara Avenue
                    Suite 200
                    Las Vegas, NV 89117
                    (702) 475-7964

Audio Operator:  Illuminada Starzyk, ECR

Transcription Company:  Access Transcripts, LLC
                            10110 Youngwood Lane
                            Fishers, IN 46038
                            (855) 873-2223
                            www.accesstranscripts.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

V. Marino - Direct                                                149

1  times a day."  Who is calling you?
2  A     Ocwen was.
3  Q     For how long were they calling you, time wise?
4  A     I would say -- let me think now -- probably -- well, let
5  me see, when did -- almost a year.
6  Q     For a year they were calling you.
7  A     Uh-huh.
8  Q     What were they calling?
9  A     They would call and when I did answer the phone --
10 Q     No, no, what would they call?  Was it your house phone,
11 your cell?
12 A     My cell phone.
13 Q     Okay.  And what -- well, before we get into that, so for a
14 year you were getting calls.  How often a day, if it was each
15 day?
16 A     Two, three times a day I was getting calls.
17 Q     Okay.  And were the calls always the same?
18 A     Pretty well, yes, the same.  It was an attempt to collect
19 a debt.
20 Q     Did you always answer the call?
21 A     No, I did not always answer the call.
22 Q     So how did you know --
23 A     I was at work, so I could not.
24 Q     How did you know it was Ocwen?
25 A     I recognized their number.

1  Q    Okay. So after a while, you knew their number.
2  A    I did know their number, yes. That's how often they were
3  calling.
4  Q    Okay. I don't want to go -- it sounds like you got
5  anywhere from 60 to 100 calls. Does that sound --
6  A    It was a lot of calls, yes.
7  Q    Okay. I don't want to go through each one. Can you
8  describe to the Court a particular instance of a call that
9  really affected you?
10 A    Well, there was one where Chris and I were out on our
11 patio, and the phone rang, and I said, it's Ocwen.
12      And Chris said to me, answer the phone, tell them that
13 they have to contact our lawyer, and then give them Chris
14 Burke's number.
15      And I said, I don't want to answer the phone. I said, I
16 can't deal with this anymore, I just can't do it. Excuse me.
17 So Chris started yelling at me to answer the phone, and I said,
18 I can't answer the phone, Chris, I don't want to deal with them
19 anymore.
20      And he said, answer the phone and tell them to stop
21 calling this number, and tell them to call Chris Burke; that's
22 what Chris Burke has instructed us to do; it's supposed to be
23 said and done, we're discharged; that's it.
24      So I answered the phone, and they said it was an attempt
25 to collect a debt, and I gave them the information. And then I

V. Marino - Direct                                                151

1  got off the phone, and finally I said to the person, you've got
2  to stop calling this number; I don't even know how you got this
3  number; I want you to stop calling this number; I've given you
4  the information I'm require to give you; stop trying to call me
5  to collect money on this loan.
6      So I got off the phone, and Chris said, why didn't you say
7  this and why didn't you say -- because he was like -- he said,
8  you should have asked to speak to their supervisor.
9      I said, Chris, I just -- I can't deal with this anymore;
10 they're calling my number; I don't want to deal with this
11 anymore.  So we got in a huge fight, and it was the same old
12 thing over and over again with our marriage, and I just
13 couldn't deal with it anymore.
14      And I thought because -- with the bankruptcy, that this
15 would all be said and done.  I was told that and I thought it
16 would be done, and it wasn't done.  And it kept on going on.
17 It was just every -- all the time, constant.  And I was at
18 work, and I'd say to my boss, it's -- I got two more phone
19 calls; look at this, there's two more phone calls, you know.
20     And she said, well, haven't you told them to stop calling?
21 Yes, I have, you know.  Yeah.
22 Q    And did they say they were from Ocwen?
23 A    Yes.
24 Q    And they said they were trying to collect a debt?
25 A    Yes.

V. Marino - Direct                               152

1  Q    Did they say anything, well, we knew you were in
2  bankruptcy so you don't have to pay?
3  A    No.  They never said that, ever.
4  Q    Did they say this is for informational purposes?
5  A    No, they did not.
6  Q    You've just described one phone call.  How many times
7  would you say out of their phone calls that you did answer, and
8  how many didn't you?
9  A    I don't know, I probably answered maybe a handful of phone
10 calls, probably maybe -- it's hard to think of a number in that
11 time.  I mean, 20, I don't know.  It seems to me that after a
12 while, I was just -- I couldn't take it anymore.  I just
13 couldn't take it anymore.  It was like I overwhelmed by it.  I
14 mean, It was affecting me in every way, so I couldn't do it.
15 Q    What way did it affect you?
16 A    I was getting stomach aches and I could sleep, and I was
17 fighting with Chris, and I was -- I was a nervous wreck.  I was
18 just a nervous wreck.
19 Q    Tell me about your stomach aches.  Did you have any prior
20 stomach problems?
21 A    No.
22 Q    And when did the stomach problems start?
23 A    Well, they started basically when we were trying to modify
24 the loan with Ocwen.  And they just -- it was so inept, and
25 they were so inept that I -- we couldn't get anywhere with

1  losing your property caused you to have some stomach issues and
2  various other issues, fighting with your husband and so forth.
3  Is that correct?
4  A    Correct.
5  Q    And you mentioned in your testimony that they started back
6  when you were trying to modify your loan.  Is that correct?
7  A    Uh-huh.
8  Q    And you also -- is it correct that you moved out of the
9  property roughly in the summer of 2011?
10 A    Correct.
11 Q    So is it fair to say that you were attempting to modify
12 your loan prior to moving out of the property?
13 A    Correct.
14 Q    Is it fair to say that the stomach problems began back in
15 summer 2011 at the latest?
16 A    Yeah.  It would be fair to say this.
17          MR. PAYNE:  That's all I have, Your Honor.  Thank
18 you.
19          THE COURT:  Okay.  Mr. Burke?
20                    REDIRECT EXAMINATION
21 BY MR. BURKE:
22 Q    Simply, they started back in 2011 when you were trying to
23 modify your loan, your stomach problems?
24 A    Correct.
25 Q    Was there a point where it ceased?  In other words, did it

                                                                173

**C E R T I F I C A T I O N**

I, Ilene Watson, court-approved transcriber, hereby certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

_[signature]_

ILENE WATSON, AAERT NO. 447      DATE:   June 30, 2016
ACCESS TRANSCRIPTS, LLC


**C E R T I F I C A T I O N**

I, Lisa Luciano, court-approved transcriber, hereby certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

_[signature]_

LISA LUCIANO, AAERT NO. 327      DATE:   June 30, 2016
ACCESS TRANSCRIPTS, LLC