# EXHIBIT "A"

In re Marino, 577 B.R. 772 (2017)
Bankr. L. Rep. P 83,191, 18 Cal. Daily Op. Serv. 10,658...

577 B.R. 772
United States Bankruptcy Appellate
Panel of the Ninth Circuit.

IN RE: Christopher Michael MARINO
and Valerie Margaret Marino, Debtors.
Ocwen Loan Servicing, LLC,
Appellant/Cross–Appellee,
v.
Christopher Michael Marino; Valerie Margaret
Marino, Appellees/Cross–Appellants.

BAP No. NV–16–1229–FLTi
|
NV–16–1238–FLTi (Cross–Appeals)
|
Bk. No. 3:13–bk–50461–BTB
|
Argued and submitted on
December 1, 2017 at Reno, Nevada
|
Filed December 22, 2017

**Synopsis**
**Background:** Chapter 7 debtors filed motions to reopen their case and to hold creditor in contempt for its alleged violation of the discharge injunction in sending them correspondence that contained demands for payment on their mortgage loan, even though the debt had been discharged and they had surrendered and vacated the property that had secured it. The United States Bankruptcy Court for the District of Nevada, Bruce T. Beesley, J., reopened the case and, following trial, awarded debtors damages, including $119,000 in emotional distress damages, which amounted to $1,000 for each improper written or telephonic contact. After its motion for reconsideration was denied, creditor appealed. Debtors filed cross-appeal with respect to the bankruptcy court's failure to award punitive damages.

**Holdings:** The Bankruptcy Appellate Panel (BAP), Robert J. Faris, J., held that:

[1] the bankruptcy court did not err in finding that creditor knowingly and willfully violated the discharge injunction through its written correspondence with debtors;

[2] the bankruptcy court properly considered creditor's telephone calls in its award of damages;

[3] the $119,000 award for emotional distress damages was reasonable and supported by the evidence; and

[4] the bankruptcy court had authority to award "relatively mild" noncompensatory fines or punitive damages.

Affirmed in part, vacated and remanded in part.

West Headnotes (30)

[1] **Bankruptcy** ⟵ Conclusions of law; de novo review

Bankruptcy Appellate Panel (BAP) reviews de novo questions of law, including whether the bankruptcy court applied the correct legal standard.

[2] **Bankruptcy** ⟵ Conclusions of law; de novo review

"De novo review" requires that the Bankruptcy Appellate Panel (BAP) consider a matter anew, as if no decision had been rendered previously.

[3] **Bankruptcy** ⟵ Particular cases and issues

Bankruptcy court's finding of a willful violation of the discharge injunction is a factual finding reviewed for clear error. 11 U.S.C.A. § 524(a)(2).

[4] **Bankruptcy** ⟵ Clear error

Bankruptcy court's finding of fact is "clearly erroneous" if it is illogical, implausible, or without support in the record.

[5] **Bankruptcy** ⟵ Clear error

Case 13-50461-btb    Doc 157-1    Entered 09/15/20 15:40:46    Page 3 of 17

In re Marino, 577 B.R. 772 (2017)
Bankr. L. Rep. P 83,191, 18 Cal. Daily Op. Serv. 10,658...

Bankruptcy court's choice among multiple plausible views of the evidence cannot be clear error.

[6]  **Bankruptcy** ⇐ Discretion

Bankruptcy Appellate Panel (BAP) reviews for abuse of discretion the bankruptcy court's decision to impose sanctions for contempt. 11 U.S.C.A. § 105(a).

[7]  **Bankruptcy** ⇐ Discretion

Bankruptcy Appellate Panel (BAP) reviews the bankruptcy court's denial of a motion for reconsideration for abuse of discretion. Fed. R. Civ. P. 59(e); Fed. R. Bankr. P. 9023.

2 Cases that cite this headnote

[8]  **Bankruptcy** ⇐ Discretion

To determine whether the bankruptcy court has abused its discretion, the Bankruptcy Appellate Panel (BAP) conducts a two-step inquiry: (1) the BAP reviews de novo whether the bankruptcy court identified the correct legal rule to apply to the relief requested, and (2) if it did, whether the bankruptcy court's application of the legal standard was illogical, implausible, or without support in inferences that may be drawn from the facts in the record.

[9]  **Bankruptcy** ⇐ Carrying out provisions of Code

**Bankruptcy** ⇐ Violation of discharge order

Party who knowingly violates the discharge injunction may be held in contempt under the section of the Bankruptcy Code authorizing the bankruptcy court to issue any order that is necessary or appropriate to carry out the provisions of the Code. 11 U.S.C.A. §§ 105(a), 524(a)(2).

[10] **Bankruptcy** ⇐ Violation of discharge order

Ninth Circuit follows a two-part test to determine whether the creditor-contemnor knowingly and willfully committed a violation of the discharge injunction, whereby the movant must prove that the creditor: (1) knew the discharge injunction was applicable, and (2) intended the actions which violated the injunction. 11 U.S.C.A. §§ 105(a), 524(a)(2).

1 Cases that cite this headnote

[11] **Bankruptcy** ⇐ Violation of discharge order

Under the first prong of its two-part test to determine whether the contemnor knowingly and willfully committed a violation of the discharge injunction, the Ninth Circuit has crafted a strict standard for the actual knowledge requirement, requiring evidence showing the alleged contemnor was aware of the discharge injunction and aware that it applied to his or her claim. 11 U.S.C.A. §§ 105(a), 524(a)(2).

[12] **Bankruptcy** ⇐ Violation of discharge order

Under the first prong of the Ninth Circuit's two-part test to determine whether the contemnor knowingly and willfully committed a violation of the discharge injunction, whether a party is aware that the discharge injunction is applicable to his or her claim is a fact-based inquiry which implicates the party's subjective belief, even an unreasonable one. 11 U.S.C.A. §§ 105(a), 524(a)(2).

1 Cases that cite this headnote

[13] **Bankruptcy** ⇐ Violation of discharge order

Under the second prong of the Ninth Circuit's two-part test to determine whether the contemnor knowingly and willfully committed a violation of the discharge injunction, in determining whether the contemnor intended the action that violated the injunction, the focus is on whether the contemnor's conduct violated the injunction and whether that conduct was intentional; it does not

Case 13-50461-btb    Doc 157-1    Entered 09/15/20 15:40:46    Page 4 of 17

In re Marino, 577 B.R. 772 (2017)
Bankr. L. Rep. P 83,191, 18 Cal. Daily Op. Serv. 10,658...

require a specific intent to violate the injunction.

11 U.S.C.A. §§ 105(a), 524(a)(2).

1 Cases that cite this headnote

[14]    **Bankruptcy** ← Contempt

Standard for finding a party in civil contempt is well settled: the moving party has the burden of showing by clear and convincing evidence that the contemnors violated a specific and definite order of the court, after which the burden shifts to the contemnors to demonstrate why they were unable to comply.

[15]    **Bankruptcy** ← Violation of discharge order

Consistent with the Ninth Circuit's reluctance to hold an unwitting creditor in contempt, each prong of the circuit's two-part test for a finding of contempt in the context of a violation of the Bankruptcy Code's discharge injunction requires a different analysis, and distinct, clear, and convincing evidence supporting that analysis, before a finding of willfulness can be made. 11 U.S.C.A. §§ 105(a), 524(a)(2).

1 Cases that cite this headnote

[16]    **Bankruptcy** ← Discharge as injunction

Bankruptcy discharge is automatic and self-effectuating; creditors must obey it, even if debtors do not assert it. 11 U.S.C.A. § 524(a)(2).

[17]    **Bankruptcy** ← Discharge as injunction

Bankruptcy discharge prohibits not just litigation, but also informal collection activities, such as dunning notices and telephone calls. 11 U.S.C.A. § 524(a)(2).

[18]    **Bankruptcy** ← Effect as to Securities and Liens

Bankruptcy discharge has one important limit, namely, it bars only efforts to collect debts as a personal liability of the debtor; this means that secured creditors can foreclose their liens after the discharge is entered. 11 U.S.C.A. § 524(a)(2).

4 Cases that cite this headnote

[19]    **Bankruptcy** ← Effect as to Securities and Liens

Lienholder may communicate with a discharged debtor only to the extent necessary to preserve or enforce its lien rights, and may not attempt to induce the debtor to pay the debt. 11 U.S.C.A. § 524(a)(2).

3 Cases that cite this headnote

[20]    **Bankruptcy** ← Discharge as injunction

Creditor may not use a contact to "coerce" or "harass" a discharged debtor. 11 U.S.C.A. § 524(a)(2).

[21]    **Bankruptcy** ← Violation of discharge order

Bankruptcy court did not err in finding that creditor knowingly and willfully violated the discharge injunction through its written correspondence with Chapter 7 debtors; creditor's letters went far beyond what was necessary to protect or enforce its lien rights, but were meant to induce debtors to make payments post-discharge, as notices and statements gave impression that debtors were still liable for mortgage payments, taxes, and force-placed insurance premiums, cumulative effect of all letters demanding money created perception that debtors needed to pay even if some notices may not have violated the injunction, correspondence, as embellished by creditor, was not authorized by state or federal law, and disclaimer language found in 15 of 22 letters did not protect creditor from liability, as some disclaimers spoke of bankruptcy as only a hypothetical possibility despite creditor's knowledge of debtors' filing, and remaining

Case 13-50461-btb    Doc 157-1    Entered 09/15/20 15:40:46    Page 5 of 17

In re Marino, 577 B.R. 772 (2017)
Bankr. L. Rep. P 83,191, 18 Cal. Daily Op. Serv. 10,658...

disclaimers were internally inconsistent and confusing. 11 U.S.C.A. §§ 105(a), 524(a)(2).

1 Cases that cite this headnote

[22]  **Finance, Banking, and Credit** ⟸ Persons and Transactions Subject to or Protected by Regulation

Fair Debt Collection Practices Act (FDCPA) generally does not apply to mortgage foreclosures. Consumer Credit Protection Act, § 802 et seq., 15 U.S.C.A. § 1692 et seq.

[23]  **Bankruptcy** ⟸ Damages and attorney fees
**Bankruptcy** ⟸ Presentation of grounds for review

In awarding damages to Chapter 7 debtors for creditor's violation of the discharge injunction, the bankruptcy court properly considered creditor's numerous post-discharge telephone calls to debtors, even though debtors' motion for contempt focused exclusively on creditor's written correspondence; the calls in question repeatedly demanded payment of the discharged debt, creditor was on notice that debtors sought sanctions for violation of the discharge injunction and should reasonably have known that trial on the matter could span all instances of improper contact with debtors, and creditor never objected during trial to any testimony regarding telephone calls, so it waived any such objection.

11 U.S.C.A. §§ 105(a), 524(a)(2).

1 Cases that cite this headnote

[24]  **Bankruptcy** ⟸ Damages and attorney fees

In awarding damages to Chapter 7 debtors for creditor's violation of the discharge injunction, the bankruptcy court did not clearly err in determining that creditor made 100 post-discharge telephone calls to debtors, even though call log provided by creditor in support of its motion for reconsideration purported to show that creditor only called debtors 35 times during applicable period; evidence at trial included debtor's testimony that creditor called three to five times a day for a year, that she did not pick up all of creditor's calls because she did not want to be harassed, that she may have answered 20 of the calls, and that she may have received between 60 and 100 calls from creditor, creditor acknowledged at trial that it made calls to debtors, though it did not produce any evidence regarding the number of calls, and call logs were not "newly discovered evidence" properly considered on reconsideration. 11 U.S.C.A. §§ 105(a), 524(a)(2); Fed. R. Civ. P. 59(e); Fed. R. Bankr. P. 9023.

[25]  **Bankruptcy** ⟸ Judgment or Order

Motion to alter or amend judgment may not be used to raise arguments or present evidence for the first time when they could reasonably have been raised earlier in the litigation. Fed. R. Civ. P. 59(e); Fed. R. Bankr. P. 9023.

[26]  **Bankruptcy** ⟸ Damages and attorney fees

In awarding damages to Chapter 7 debtors for creditor's violation of the discharge injunction, the bankruptcy court's award of $119,000 for emotional distress damages, which amounted to $1,000 for each improper written or telephonic contact, was reasonable and supported by the evidence; court's award took into account debtors' circumstances, as debtors and their friend testified that debtors' health and relationship improved after they filed for bankruptcy but deteriorated again when creditor began contacting them post-discharge.

11 U.S.C.A. §§ 105(a), 524(a)(2).

[27]  **Bankruptcy** ⟸ Damages and attorney fees

The Ninth Circuit has allowed emotional distress damages for automatic stay violations when the debtor (1) suffers significant harm, (2) clearly establishes the significant harm, and (3) demonstrates a causal connection between that significant harm and the stay violation, as distinct, for instance, from the anxiety and pressures inherent in the bankruptcy process;

Case 13-50461-btb    Doc 157-1    Entered 09/15/20 15:40:46    Page 6 of 17

In re Marino, 577 B.R. 772 (2017)
Bankr. L. Rep. P 83,191, 18 Cal. Daily Op. Serv. 10,658...

the same rule should apply to violations of the discharge injunction. 11 U.S.C.A. §§ 105(a), 362(k), 524(a)(2).

1 Cases that cite this headnote

[28] Bankruptcy — Exemplary or punitive damages; fines

While, in the Ninth Circuit, bankruptcy courts are prohibited from assessing any "serious" punitive damages for a violation of the discharge injunction, such courts may assess "relatively mild" noncompensatory fines or punitive damages. 11 U.S.C.A. §§ 105(a), 524(a)(2).

2 Cases that cite this headnote

[29] Bankruptcy — Submission to district court for judgment

Bankruptcy — Exemplary or punitive damages; fines

Upon Chapter 7 debtors' motion for punitive damages for creditor's violation of the discharge injunction, the bankruptcy court, as an alternative to awarding "relatively mild" noncompensatory fines or punitive damages, might choose to issue proposed findings and a recommended judgment on punitive damages to the district court, or refer the matter to the district court for criminal contempt proceedings. 11 U.S.C.A. §§ 105(a), 524(a)(2).

[30] Bankruptcy — Stay enforcement

Bankruptcy — Exemplary or punitive damages; fines

Restriction on bankruptcy court's power to grant punitive damages and punish contempt, as for a creditor's violation of the discharge injunction, stems from the fact that bankruptcy judges lack life tenure; district judges do not face that restriction. 11 U.S.C.A. §§ 105(a), 524(a)(2).

*776 Appeal from the United States Bankruptcy Court for the District of Nevada, Honorable Bruce T. Beesley, Bankruptcy Judge, Presiding

**Attorneys and Law Firms**

Jonathan Fink of Wright, Finlay & Zak, LLP argued for appellant/cross-appellee Ocwen Loan Servicing, LLC; Christopher P. Burke argued for appellees/cross-appellants Christopher Michael Marino and Valerie Margaret Marino.

Before: FARIS, LAFFERTY, and TIGHE,[*] Bankruptcy Judges.

## OPINION

FARIS, Bankruptcy Judge:

### INTRODUCTION

Chapter 7[1] debtors Christopher Michael Marino and Valerie Margaret Marino sought sanctions against creditor Ocwen Loan Servicing, LLC ("Ocwen") for its violation of the discharge injunction. The bankruptcy court held a trial and awarded the Marinos $119,000—one thousand dollars for each improper contact.

On appeal, Ocwen argues that the bankruptcy court erred because its correspondence with the Marinos was in compliance with state or federal law. It also contends that the court improperly considered telephone calls, which were not the subject of the motion and not supported by evidence, and that there was no evidence of injury to the Marinos. We discern no error and AFFIRM.

The Marinos cross-appeal, correctly arguing that the bankruptcy court erred in holding that it lacked the authority to award punitive damages. On this point, we VACATE and REMAND so the bankruptcy court can consider whether it would be appropriate to (a) enter a final judgment for "relatively mild noncompensatory fines," (b) issue, for the district court's consideration, proposed findings and a recommended judgment for punitive damages, or (c) refer the issue of contempt to the district court.

*777 **FACTUAL BACKGROUND**

Case 13-50461-btb    Doc 157-1    Entered 09/15/20 15:40:46    Page 7 of 17

In re Marino, 577 B.R. 772 (2017)
Bankr. L. Rep. P 83,191, 18 Cal. Daily Op. Serv. 10,658...

### A. The Marinos' chapter 7 petition

The Marinos filed a chapter 7 bankruptcy petition in March 2013 in the United States Bankruptcy Court for the District of Nevada. They scheduled real property located in Verdi, California (the "Property") and noted, "DEBTOR TO SURRENDER."[2] GMAC Mortgage held a secured claim arising from a second mortgage on the Property.

The Marinos received their discharge on June 18, 2013. The bankruptcy court subsequently granted Deutsche Bank National Trust Company, as Trustee for GMACM Mortgage Loan Trust 2005–AR6 ("Deutsche Bank") relief from the automatic stay. The court closed the case on September 23, 2013.

### B. Written correspondence and telephone calls from Ocwen

Following the Marinos' discharge, Ocwen, as the servicer for Deutsche Bank, began sending the Marinos mailed correspondence in June 2013 and continued to do so through April 2015. The letters included account statements, notices regarding force-placed insurance, escrow statements, and other matters.

Some of the items of correspondence contained disclaimers that were located at the bottom of a page or end of the letter in small font. A typical disclaimer read: "If you have filed for bankruptcy and your case is still active and/or if you received a discharge, please be advised that this notice is for information purposes only and is not an attempt to collect a pre-petition or discharged debt." Often, the disclaimers were preceded by demands for payment by a certain date or information about the amount that "you must pay" in a much more conspicuous font.

Ocwen also called the Marinos numerous times post-discharge to request payment on their mortgage loan.

### C. The motion for contempt

In November 2015, the Marinos filed a motion to reopen their case and to hold Ocwen in contempt for its alleged violation of the discharge injunction ("Motion for Contempt"). They argued that Ocwen knowingly and willfully violated the discharge injunction by sending the written correspondence after the Marinos' discharge. They identified twenty-two instances of allegedly improper correspondence[3] whereby Ocwen sought to collect from the Marinos personally.

In opposition to the Motion for Contempt, Ocwen argued that sanctions were not warranted because the letters were not meant to collect any debt against the Marinos personally and complied with federal and state law. It said that fourteen of the twenty-two letters contained disclaimer language stating that the letters were intended for informational purposes only, not to collect any debt. It argued that billing statements did not violate the discharge injunction under California law because they sought only voluntary payments. It contended that the remaining correspondence concerned force-placed insurance, escrow information, or debt validation, not collection of a debt.

### D. Evidentiary hearing

The bankruptcy court reopened the case and held an evidentiary hearing on the *778 Motion for Contempt. At the outset, and by agreement of the parties, the court found "that Ocwen was aware of the bankruptcy, was aware of the discharge, got stay relief, and sent the various letters." The only remaining issues were Ocwen's intent and damages.

Mr. Marino testified that the Property was their "dream house," but they faced financial difficulty starting in 2010. They unsuccessfully tried to work with GMAC and Ocwen to modify their mortgage payments, but eventually moved out in 2011.

After they filed for chapter 7 bankruptcy and received their discharge in mid–2013, the Marinos began to receive letters from Ocwen "stating that there was money due." The correspondence included account statements with attached payment stubs and demands for payment. Mr. Marino testified that the payment stubs indicated that he had to remit payment on the discharged debt, that he was responsible for the interest payments, and that payments were due by the stated dates. Ocwen also sent notices of force-placed insurance, which made Mr. Marino think that he had to pay for the insurance on the Property, even though they had surrendered and vacated it.

Mr. Marino said that the notices from Ocwen took a toll on his marriage and caused him to fight with his wife. He said that he suffered from anxiety attacks and felt humiliated, tormented, and harassed. He testified that the stress eventually made them contemplate divorce, although they managed to preserve their marriage.

Mrs. Marino testified that the letters and calls from Ocwen caused distress to the point that she and her husband

Case 13-50461-btb    Doc 157-1    Entered 09/15/20 15:40:46    Page 8 of 17

In re Marino, 577 B.R. 772 (2017)
Bankr. L. Rep. P 83,191, 18 Cal. Daily Op. Serv. 10,658...

considered divorce. She stated that she began having severe stomach pains when they tried to modify the mortgage loan; those pains disappeared when they filed for bankruptcy, but reemerged when they began receiving calls post-discharge. In June 2014, she noted in writing that Ocwen was "calling me three to five times a day" for approximately a year. At trial, she did not provide an exact number of calls that she received, but testified:

> Q Okay. I don't want to go—it sounds like you got anywhere from 60 to 100 calls. Does that sound—
>
> A It was a lot of calls, yes.

She also stated, "I probably answered maybe a handful of phone calls, probably maybe—it's hard to think of a number in that time. I mean, 20, I don't know. It seems to me that after a while, I was just—I couldn't take it anymore."

A friend of the Marinos, Bernadette O'Kane, testified about her observations of the Marinos during their financial distress. Ms. O'Kane stated that Mrs. Marino became sad and upset due to dealing with creditors, started suffering stomach pains, and told Ms. O'Kane that her marital relationship had become strained. Ms. O'Kane said that Mr. Marino was previously fun-loving but became agitated and angry.

Ms. O'Kane said that, following the discharge, the Marinos were not able to move on with their lives, because "the calls [from creditors] did not stop." She said that the calls made Mrs. Marino cry; when Ms. O'Kane on occasion picked up such calls, the caller would assume that she was Mrs. Marino and repeatedly ask for payment.

Sony Prudent, a senior loan analyst for Ocwen, testified as to Ocwen's loan servicing procedure. He stated that Ocwen keeps a comment log of all contacts with a borrower and that Owen might still send notices post-discharge pursuant to federal or state regulation, but that there would be a bankruptcy disclaimer stating that the letter was not an attempt to collect a debt "if you've been discharged or in active bankruptcy."

*779 Mr. Prudent stated that he reviewed the Marinos' file before testifying, including the transaction history and comment logs. He testified that the comment logs reflect that Ocwen called the Marinos post-discharge but that it did not make any calls to the Marinos after the Property was foreclosed (approximately two years after the court granted Ocwen stay relief).

The court repeatedly questioned Mr. Prudent as to why post-discharge letters might still say, "you must pay." Mr. Prudent had no direct answer but stated, "[b]est answer, Your Honor, is it would be a generic letter." He later said, "[i]t is an internal policy, Your Honor." He also admitted that "[m]ost of [the letters] are generated by our system" and were never reviewed by a human being.

The bankruptcy court ordered additional briefing regarding the correspondence, asking Ocwen to cite the specific statute or regulation authorizing each document. Ocwen cited the applicable regulatory or statutory basis that allegedly applied to some of its correspondence: 12 C.F.R. § 1024.37(c) (required notice of force-placed insurance),[4] 12 U.S.C. §§ 2605 and 2609 (required notice of escrow account balance),[5] 15 U.S.C. § 1692g (required notice of debt validation information),[6] and California Civil Code §§ 2924(a)(1)(A) (required notice of default),[7] 2923.5 (required *780 contact prior to notice of default),[8] and 2924.9 (required contact post-default).[9]

On June 20, 2016, the bankruptcy court announced its ruling in favor of the Marinos. The court rejected Ocwen's defense that the correspondence was authorized by state or federal law, stating that, "I think if all they sent was what was required by the notice [sic], they would be fine. But in each of those cases, they included additional language, which indicated that they were trying to collect money from the debtor."

The bankruptcy court held that the letters and phone calls indicated that Ocwen was trying to get the Marinos to make payments on their mortgage loan: "Ocwen could not have been doing anything but trying to get the debtor to give them some more money, either for insurance or agree to be responsible for the house that was vacant, even after they had ... received stay relief." The court said that Ocwen purposefully waited two years to foreclose on the Property, "hoping that if they sent enough letters and gave enough calls, that the debtor would ultimately pay them some money for something."

The court found the disclaimer language ineffective. It said that the disclaimers stated, "if you have filed for bankruptcy" and "if you have received a discharge," even though Ocwen knew that the Marinos had filed for bankruptcy and received a discharge. It said that creditors that know that a debtor has

Case 13-50461-btb   Doc 157-1   Entered 09/15/20 15:40:46   Page 9 of 17

In re Marino, 577 B.R. 772 (2017)
Bankr. L. Rep. P 83,191, 18 Cal. Daily Op. Serv. 10,658...

filed for bankruptcy, received a discharge, and surrendered their home do not have "the right to have their computer gen out [sic] these various letters, which do comply, at least in some of the provisions, with the various notification statutes, but all of which include language which is not included in those statutes, which, to varying degrees of urgency, want the debtor to undertake a new obligation or pay them money."

The court also found that Ocwen had called approximately a hundred times following the discharge to ask the Marinos to pay the discharged debt. It noted that Ocwen failed to rebut the Marinos' testimony and failed to produce any records or evidence to the contrary.

The bankruptcy court awarded the Marinos damages for emotional distress, actual damages, and attorneys' fees and costs. It stated that the Marinos had established that they had suffered emotional distress as a result of Ocwen's harassing calls and letters. The court found that Ocwen had sent nineteen offending letters and made one hundred phone calls, and it awarded $1,000 per letter and call as emotional distress damages. The court entered an order ("Sanctions Order") awarding the Marinos $119,000 in emotional distress damages.

Regarding an award of punitive damages, the court stated: "The issue of damages, I—as I understand the law of the Ninth Circuit, I do not have authority to impose punitive damages. If I did, I probably would, but I don't."

\*781 Ocwen timely appealed the Sanctions Order.

### E. The motion for reconsideration

Ocwen filed a motion for reconsideration of the Sanctions Order ("Motion for Reconsideration") under Civil Rule 59(e), made applicable in bankruptcy through Rule 9023. It argued that it made far fewer calls to the Marinos than the one hundred calls that the court had found and that it did not provide any rebuttal evidence at trial because the Marinos did not raise the issue of telephone calls until late in the proceedings.

Ocwen contended that it had "newly discovered" evidence in the form of Ocwen's call logs. It provided the affidavit of a loan analyst for Ocwen who testified that Ocwen made thirty-five calls to the Marinos post-discharge.

The bankruptcy court denied the Motion for Reconsideration by form order ("Reconsideration Order") without any detailed reasoning. Although the court apparently held a hearing on the Motion for Reconsideration, a transcript of the hearing is not in the record on appeal.

Ocwen amended its notice of appeal to include the Reconsideration Order.

### JURISDICTION

The bankruptcy court had jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(b)(1). We have jurisdiction under 28 U.S.C. § 158.

### ISSUES

(1) Whether the bankruptcy court erred in awarding the Marinos $119,000 for violations of the discharge injunction.

(2) Whether the bankruptcy court erred in holding that it lacked the authority to award punitive damages.

### STANDARDS OF REVIEW

[1] [2] We review de novo questions of law, including whether the bankruptcy court applied the correct legal standard. See Drummond v. Welsh (In re Welsh), 465 B.R. 843, 847 (9th Cir. BAP 2012), aff'd, 711 F.3d 1120 (9th Cir. 2013). De novo review requires that we consider a matter anew, as if no decision had been rendered previously. United States v. Silverman, 861 F.2d 571, 576 (9th Cir. 1988).

[3] [4] [5] The bankruptcy court's finding of a willful violation of § 524 is a factual finding reviewed for clear error. Emmert v. Taggart (In re Taggart), 548 B.R. 275, 286 (9th Cir. BAP 2016). A finding of fact is clearly erroneous if it is illogical, implausible, or without support in the record. Retz v. Samson (In re Retz), 606 F.3d 1189, 1196 (9th Cir. 2010). The bankruptcy court's choice among multiple plausible views of the evidence cannot be clear error. United States v. Elliott, 322 F.3d 710, 715 (9th Cir. 2003).

Case 13-50461-btb    Doc 157-1    Entered 09/15/20 15:40:46    Page 10 of 17

In re Marino, 577 B.R. 772 (2017)
Bankr. L. Rep. P 83,191, 18 Cal. Daily Op. Serv. 10,658...

[6] [7] [8] We review for abuse of discretion the bankruptcy court's decision to impose sanctions for contempt. Knupfer v. Lindblade (In re Dyer), 322 F.3d 1178, 1191 (9th Cir. 2003); Nash v. Clark Cty. Dist. Atty's Office (In re Nash), 464 B.R. 874, 878 (9th Cir. BAP 2012). Similarly, we review the bankruptcy court's denial of a motion for reconsideration for abuse of discretion. Cruz v. Stein Strauss Tr. # 1361, PDQ Invs., LLC (In re Cruz), 516 B.R. 594, 601 (9th Cir. BAP 2014) (citing Tracht Gut, LLC v. Cty. of L.A. Treasurer & Tax Collector (In re Tracht Gut, LLC), 503 B.R. 804, 810 (9th Cir. BAP 2014)). To determine whether the bankruptcy court has abused its discretion, we conduct a two-step inquiry: (1) we review de novo whether the bankruptcy court "identified the correct legal rule to apply to the relief requested" and (2) if it did, whether the *782 bankruptcy court's application of the legal standard was illogical, implausible, or without support in inferences that may be drawn from the facts in the record. United States v. Hinkson, 585 F.3d 1247, 1262–63 & n.21 (9th Cir. 2009) (en banc).

## DISCUSSION

### A. Ocwen's appeal

#### 1. The bankruptcy court may sanction a creditor that knowingly and willfully violates the discharge injunction.

Section 727(a) provides that, absent certain exceptions, "[t]he [bankruptcy] court shall grant the debtor a discharge." The discharge order "discharges the debtor from all debts that arose before the date of the [bankruptcy filing]." § 727(b). More specifically, a discharge "operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived[.]" § 524(a)(2).

[9] [10] "A party who knowingly violates the discharge injunction under § 524(a)(2) can be held in contempt under § 105(a)." In re Taggart, 548 B.R. at 286. The Ninth Circuit follows a two-part test to determine whether the contemnor knowingly and willfully committed a violation of the discharge injunction: "the movant must prove that the creditor (1) knew the discharge injunction was applicable and (2) intended the actions which violated the injunction."

Zilog, Inc. v. Corning (In re Zilog, Inc.), 450 F.3d 996, 1007 (9th Cir. 2006) (quoting Renwick v. Bennett (In re Bennett), 298 F.3d 1059, 1069 (9th Cir. 2002)).

[11] [12] First, the movant must prove that the contemnor knew that the discharge injunction was applicable to his claim:

> [T]he Ninth Circuit has crafted a strict standard for the actual knowledge requirement in the context of contempt before a finding of willfulness can be made. This standard requires evidence showing the alleged contemnor was aware of the discharge injunction and aware that it applied to his or her claim. Whether a party is aware that the discharge injunction is applicable to his or her claim is a fact-based inquiry which implicates a party's subjective belief, even an unreasonable one.

In re Taggart, 548 B.R. at 288.

[13] Second, the contemnor must have intended the action that violated the injunction. "The focus is on whether the creditor's conduct violated the injunction and whether that conduct was intentional; it does not require a specific intent to violate the injunction." Desert Pine Villas Homeowners Ass'n v. Kabiling (In re Kabiling), 551 B.R. 440, 445 (9th Cir. BAP 2016). We have stated:

> the analysis concerning a "willful" violation of the discharge injunction is the same as a finding of willfulness in connection with violation of the automatic stay under § 365(k). In connection with the second prong's intent requirement, we have previously observed that "the bankruptcy court's focus is not on the offending party's subjective beliefs or intent, but on whether the party's conduct in fact complied with the order at issue."

In re Taggart, 548 B.R. at 288 (quoting Rosales v. Wallace (In re Wallace), BAP No. NV-11-1681-KiPaD, 2012 WL 2401871, at *5 (9th Cir. BAP June 26, 2012)).

Case 13-50461-btb    Doc 157-1    Entered 09/15/20 15:40:46    Page 11 of 17

In re Marino, 577 B.R. 772 (2017)
Bankr. L. Rep. P 83,191, 18 Cal. Daily Op. Serv. 10,658...

[14] [15] "The standard for finding a party in civil contempt is well settled: The *783 moving party has the burden of showing by clear and convincing evidence that the contemnors violated a specific and definite order of the court. The burden then shifts to the contemnors to demonstrate why they were unable to comply." Id. at 286 (quoting In re Bennett, 298 F.3d at 1069). "[E]ach prong of the Ninth Circuit's two-part test for a finding of contempt in the context of a discharge violation requires a different analysis, and distinct, clear, and convincing evidence supporting that analysis, before a finding of willfulness can be made. This is consistent with the Ninth Circuit's reluctance to hold an unwitting creditor in contempt." Id. at 288 (citation and internal quotation marks omitted).

### 2. The bankruptcy court did not err in finding that Ocwen's communication with the Marinos knowingly and willfully violated the discharge injunction.

In the present case, there is no dispute that Ocwen knew that the discharge injunction was applicable to its claim and that it intentionally sent the letters and placed the phone calls. Rather, Ocwen argues that its contacts with the Marinos did not violate the discharge injunction. We hold that both the written correspondence and the telephone calls were knowing and willful violations.

#### a. The bankruptcy court properly found that the written correspondence violated the discharge injunction.

The discharge has long been an important feature of American bankruptcy law. Over eighty years ago, the Supreme Court described its purpose and importance:

> One of the primary purposes of the Bankruptcy Act is to relieve the honest debtor from the weight of oppressive indebtedness, and permit him to start afresh free from the obligations and responsibilities consequent upon business misfortunes. This purpose of the act has been again and again emphasized by the courts as being of public as well as private interest, in that it gives to the honest but unfortunate debtor who surrenders for distribution the property which he owns at the time of bankruptcy, a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of pre-existing debt. The various provisions of the Bankruptcy Act were adopted in the light of that view and are to be construed when reasonably possible in harmony with it so as to effectuate the general purpose and policy of the act.

Local Loan Co. v. Hunt, 292 U.S. 234, 244–45, 54 S.Ct. 695, 78 L.Ed. 1230 (1934) (citations and internal quotation marks omitted).

[16] The discharge is automatic and self-effectuating. Creditors must obey it, even if debtors do not assert it. Pavelich v. McCormick, Barstow, Sheppard, Wayte & Carruth LLP (In re Pavelich), 229 B.R. 777, 781–82 (9th Cir. BAP 1999).

[17] The discharge prohibits not just litigation, but also informal collection activities, such as dunning notices and telephone calls. See In re Feldmeier, 335 B.R. 807, 813 (Bankr. D. Or. 2005) ("Among the collection activity prohibited by the discharge injunction are 'telephone calls, letters, and personal contacts.'" (citation omitted)).

[18] The discharge has one important limit: it bars only efforts to collect debts "as a personal liability of the debtor." § 524(a)(2). This means that secured creditors can foreclose their liens after the discharge is entered. Johnson v. Home State Bank, 501 U.S. 78, 83, 111 S.Ct. 2150, 115 L.Ed.2d 66 (1991) (explaining that a discharge extinguishes only the personal liability *784 of the debtor, and that a creditor's right to foreclose on a mortgage securing the debt survives or passes through the bankruptcy).

This creates some tension. While the discharge generally prohibits creditors from communicating with discharged debtors in an effort to extract payment, lienholders usually must communicate with debtors in order to enforce their liens. For example, a foreclosure of a mortgage without notice to the mortgagor would likely be invalid even if the mortgagor were not personally liable for the mortgage debt.

Case 13-50461-btb    Doc 157-1    Entered 09/15/20 15:40:46    Page 12 of 17

In re Marino, 577 B.R. 772 (2017)
Bankr. L. Rep. P 83,191, 18 Cal. Daily Op. Serv. 10,658...

[19] [20] The way to reconcile this tension is to hold that a lienholder may communicate with a discharged debtor only to the extent necessary to preserve or enforce its lien rights, and may not attempt to induce the debtor to pay the debt. As we have held, "the creditor may not use a contact to 'coerce' or 'harass' the debtor." In re Nash, 464 B.R. at 881; see United States v. Holmes (In re Holmes), BAP No. CC-94-2001-HMV, 76 A.F.T.R.2d 95-7925, 1995 WL 800102 (9th Cir. BAP 1995) ("A secured creditor cannot, under the guise of enforcing an unavoided lien, attempt to coerce the debtor into paying a discharged debt.... Even if a creditor threatens only to enforce its surviving lien, that threat will violate the discharge injunction if the evidence shows that the threat is really an effort to coerce payment of the underlying discharged debt." (citations omitted)).

[21] We agree with the bankruptcy court that Ocwen's communications went far beyond what was necessary to protect or enforce Ocwen's lien rights and that they also were meant to induce the Marinos to make payments post-discharge. The notices and statements gave the impression that the Marinos were still liable for the mortgage payments, taxes, and force-placed insurance premiums. Even if some of the notices may not have violated the discharge injunction, the bankruptcy court correctly noted that the cumulative effect of all of the letters demanding money created the perception that the Marinos needed to pay Ocwen. See In re Nordlund, 494 B.R. 507, 519 (Bankr. E.D. Cal. 2011) ("Even though some of [the bank's] written communications to the debtors seem innocuous, when [the bank's] 24 written communications over a 10-month period are considered in context and as a whole, a more disturbing picture is painted. Even if each letter from [the bank] had acknowledged the debtors' discharge and stated that [the bank] would take no action against the debtors personally to collect its three home loans, the sheer volume and repetitiveness of [the bank's] letters communicated just the opposite."). Therefore, the letters violated the discharge injunction.

Ocwen argues that the disclaimer language contained in some of the notices protects it from liability. We disagree.

First, Ocwen does not attempt to explain the fact that, of the twenty-two letters it sent to the Marinos, seven had no disclaimer language whatsoever.

Second, although Ocwen knew that the Marinos had filed for bankruptcy protection and received a discharge, thirteen of the fifteen letters with disclaimers spoke of bankruptcy as a hypothetical possibility (e.g., "if you filed for bankruptcy and your case is still active, or if you have received an order of discharge, please be advised that this is not an attempt to collect a prepetition or discharged debt"). Ocwen makes no attempt to explain why it was proper for Ocwen to obscure the fact (known to Ocwen) that the Marinos had already received a discharge.

Third, even the small number of letters that acknowledged (as Ocwen admittedly knew) that the Marinos had obtained a *785 discharge were internally contradictory. The body of these letters asserts that the Marinos must pay the debt, but the disclaimer placed at the end of the same documents told them that they need not pay the debt. This contradiction confused the Marinos and would likely confuse many similarly situated debtors. Cf. In re Anderson, 348 B.R. 652, 661 (Bankr. D. Del. 2006) (finding a violation of the discharge injunction where the letter with disclaimer language also stated confusingly that the debtors would be liable for any deficiency).

Fourth, Ocwen makes no effort to explain why it sent admittedly "generic" notices to the Marinos. In this modern age of information technology, Ocwen could and should prepare notices that are consistent with the known legal status of its borrowers. Ocwen's failure to do so must reflect either incompetence (which we doubt) or a deliberate effort to induce confused borrowers to pay discharged debts. Similarly, it was probably no accident that the improper demands for payment appear near the beginning of each letter and the disclaimers appear near the end.

Ocwen also argues that state or federal law required it to send some of the correspondence. If it were true that state or federal law required Ocwen to send all of the various letters as a condition to the preservation or enforcement of its lien rights, we might agree. But the premise is not valid.

First, Ocwen could not cite any law that authorized some of its correspondence.

[22] Second, some of the statutes and regulations cited by Ocwen simply do not apply to its correspondence. For example, Ocwen cites 15 U.S.C. § 1692g(a) to excuse the debt validation notices sent by Western Progressive (on

Case 13-50461-btb    Doc 157-1    Entered 09/15/20 15:40:46    Page 13 of 17

In re Marino, 577 B.R. 772 (2017)
Bankr. L. Rep. P 83,191, 18 Cal. Daily Op. Serv. 10,658...

Ocwen's behalf), but the Fair Debt Collection Practices Act generally does not apply to mortgage foreclosures. See Ho v. ReconTrust Co., NA, 858 F.3d 568, 572 (9th Cir. 2017) ("actions taken to facilitate a non-judicial foreclosure, such as sending the notice of default and notice of sale, are not attempts to collect 'debt' as that term is defined by the FDCPA").

Third, even when Ocwen sent legally required notices, it routinely embellished those notices with demands for payment that the applicable statutes and regulations do not require. For example, 12 C.F.R. § 1024.37(c) requires that a mortgage lender give notice of force-placed insurance; Ocwen added a demand for payment of the insurance premiums. Similarly, the escrow account notices not only provided information as to account balances in accordance with 12 U.S.C. §§ 2605 and 2609, but also informed the Marinos that, if the they did not pay the shortage, their escrow shortfall would increase. Additionally, the debt validation notices allegedly sent pursuant to 15 U.S.C. § 1692g provided information of the "total delinquency owed" and stated in large type that "WE ARE ATTEMPTING TO COLLECT A DEBT[.]" As the bankruptcy court aptly stated, Ocwen's notices may have been proper had they been limited to the required information mandated by the statutes and regulations; however, Ocwen invariably included a demand for payment that the Marinos were not legally obligated to make. Ocwen's inclusion of additional language not prescribed by the relevant statutes or regulations violated the discharge injunction.

Ocwen cites California Civil Code §§ 2924(a)(1)(A), 2923.5(a)(2), and 2924.9, which require it to contact borrowers before and after filing a notice of default. These notices were sent amidst the improper collection notices that demanded payment, so it was not unreasonable for *786 the Marinos to believe that the letters were further attempts to collect on the debt. Cf. In re Nordlund, 494 B.R. at 519 ("Taken together, and in context, the court construes the 24 letters as a deliberate attempt by [the bank] to sow confusion and doubt as to whether it would recognize the debtors' discharge. Its goal seems to have been to convince the debtors to pay the bank despite their discharge.").

In sum, the bankruptcy court did not clearly err in finding that "Ocwen could not have been doing anything but trying to get the debtor to give them some more money ...."

Ocwen's repeated dunning deprived the Marinos of a fresh start "unhampered by the pressure and discouragement of pre-existing debt." See Local Loan Co., 292 U.S. at 244, 54 S.Ct. 695.

### b. The bankruptcy court properly considered the telephone calls in its award of damages.

[23] [24] Ocwen also argues that the bankruptcy court should not have considered the telephone calls that it made to the Marinos, because (1) the issue of calls was not raised in the Motion for Contempt, and (2) the evidence provided on reconsideration shows that Ocwen made only thirty-five post-discharge calls, rather than the one hundred calls found by the court. We reject both arguments.[10]

Ocwen is correct that the Motion for Contempt focused exclusively on the written correspondence. However, Ocwen was on notice that the Marinos sought sanctions for violation of the discharge injunction; it should reasonably have known that the trial could span all instances of improper contact with the Marinos. Indeed, Ocwen's representative, Sony Prudent, testified that he had reviewed the contact logs, including telephone calls, in preparation for trial.

Moreover, Ocwen never objected during trial to any testimony regarding telephone calls. Thus, it waived any such objection.

Hansen v. Moore (In re Hansen), 368 B.R. 868, 875 (9th Cir. BAP 2007) ("A party who fails to object to evidence at trial waives the right to raise admissibility issues on appeal." (citing Price v. Kramer, 200 F.3d 1237, 1251–52 (9th Cir. 2000))).

The Marinos introduced evidence at trial that Ocwen repeatedly called them to request payment, even though they understandably could not offer a definite number of calls. Mrs. Marino testified that Ocwen called three to five times a day for a year; that she did not pick up all of Ocwen's calls because she did not want to be harassed; that she may have answered twenty of the calls; and that she may have received between sixty to one hundred calls. Mr. Marino's and Ms. O'Kane's testimony also mentioned numerous calls. At trial, Ocwen did not produce any evidence regarding the number of telephone calls, other than to acknowledge that it made calls to the Marinos. The court's finding that Ocwen called the Marinos one hundred times was not clearly erroneous.

Case 13-50461-btb    Doc 157-1    Entered 09/15/20 15:40:46    Page 14 of 17

In re Marino, 577 B.R. 772 (2017)
Bankr. L. Rep. P 83,191, 18 Cal. Daily Op. Serv. 10,658...

*787 [25] In its Motion for Reconsideration, Ocwen provided the call log from the Marinos' file that purported to show that Ocwen only called the Marinos thirty-five times during the applicable period. But " 'a motion for reconsideration should not be granted, absent highly unusual circumstances, unless the district court is presented with newly discovered evidence, committed clear error, or if there is an intervening change in the controlling law.' A [Civil] Rule 59(e) motion may **not** be used to raise arguments or present evidence for the first time when they could reasonably have been raised earlier in the litigation." Kona Enters., Inc. v. Estate of Bishop, 229 F.3d 877, 890 (9th Cir. 2000) (quoting 389 Orange St. Partners v. Arnold, 179 F.3d 656, 665 (9th Cir. 1999)). The call logs were available to Ocwen prior to trial and were referenced by Ocwen's witness; the bankruptcy court even expressed its displeasure that Ocwen did not introduce the call logs into evidence but only relied on Mr. Prudent's testimony about their contents. The logs were not "newly discovered evidence" within the meaning of Civil Rule 59(e). See Feature Realty, Inc. v. City of Spokane, 331 F.3d 1082, 1093 (9th Cir. 2003) ("Evidence 'in the possession of the party before the judgment was rendered is not newly discovered.' " (citation omitted)).

There is another independently sufficient reason to affirm. Ocwen failed to provide us with a transcript of the hearing on the Motion for Reconsideration. See Clinton v. Deutsche Bank Nat'l Tr. Co. (In re Clinton), 449 B.R. 79, 83 (9th Cir. BAP 2011) ("Without a transcript, it is impossible to determine why the bankruptcy court ruled as it did. Therefore, we have little choice but to exercise our discretion and summarily affirm the bankruptcy court's decision[.]").

### 3. The damages were reasonable and supported by the evidence.

[26] Ocwen argues that the $119,000 award is not reasonable, because the award was arbitrary and the court ignored other causes of the Marinos' emotional distress. We disagree.

[27] The Ninth Circuit has allowed emotional distress damages for automatic stay violations when the debtor "(1) suffer[s] significant harm, (2) clearly establish[es] the significant harm, and (3) demonstrate[s] a causal connection between that significant harm and the violation of the automatic stay (as distinct, for instance, from the anxiety and pressures inherent in the bankruptcy process)." Snowden v. Check Into Cash of Wash. Inc. (In re Snowden), 769 F.3d 651, 657 (9th Cir. 2014) (quoting Dawson v. Wash. Mutual Bank, F.A. (In re Dawson), 390 F.3d 1139, 1149 (9th Cir. 2004)) (discussing violation of the automatic stay). The same rule should apply to violations of the discharge injunction. See In re Nordlund, 494 B.R. at 523 (applying Dawson's three-part test to violations of the discharge injunction); C & W Asset Acquisition, LLC v. Feagins (In re Feagins), 439 B.R. 165, 178 (Bankr. D. Haw. 2010) ("Although Dawson considered the remedy for violations of the automatic stay under section 362(k)(1), the same reasoning applies to willful violations of the discharge injunction.").

Ocwen contends that the bankruptcy court's award of $1,000 per contact was arbitrary and that the total award should not have exceeded "several thousand dollars" in accordance with Dyer. But Ocwen ignores the fact that the bankruptcy court awarded compensatory damages for emotional distress, not punitive sanctions. The limit on punitive sanctions discussed in *788 Dyer[11] does not apply to a compensatory award.

Ocwen also argues that the Marinos' emotional distress predated the post-discharge communications and was not caused by its violation of the discharge injunction. But the Marinos and Ms. O'Kane testified that the Marinos' health and relationship improved after they filed for bankruptcy but deteriorated again when Ocwen began contacting them post-discharge. The bankruptcy court weighed the evidence and determined that Ocwen's violation of the discharge injunction caused the Marinos' injury. The court did not clearly err in assigning blame to Ocwen.

### B. The Marinos' cross-appeal

The Marinos argue that the court erred by failing to award punitive damages, because it erroneously believed that it lacked authority to do so. The bankruptcy court misstated the law.

[28] While the Ninth Circuit has stated that the bankruptcy courts are prohibited from assessing any "serious" punitive damages, it has left open the possibility of "relatively mild noncompensatory fines." In re Dyer, 322 F.3d at 1193. We have previously stated that, "[i]f a bankruptcy court finds that a party has willfully violated the discharge injunction, the court may award actual damages, punitive damages and attorney's fees to the debtor." In re Nash, 464 B.R. at 880

Case 13-50461-btb    Doc 157-1    Entered 09/15/20 15:40:46    Page 15 of 17

In re Marino, 577 B.R. 772 (2017)
Bankr. L. Rep. P 83,191, 18 Cal. Daily Op. Serv. 10,658...

(citing Espinosa v. United Student Aid Funds, Inc., 553 F.3d 1193, 1205 n.7 (9th Cir. 2008), aff'd, 559 U.S. 260, 130 S.Ct. 1367, 176 L.Ed.2d 158 (2010)).

Ocwen concedes that the bankruptcy court may award sanctions and that relatively mild noncompensatory fines may be permissible under some circumstances, but it argues that the bankruptcy court may not award punitive damages.

Some bankruptcy courts understand Dyer to mean that a bankruptcy court may not allow "punitive damages" for a violation of the discharge injunction but may award "relatively mild noncompensatory fines." See, e.g., In re Martinez, 561 B.R. at 175 ("this court has no authority to award punitive damages for a violation of the Discharge Injunction, but it does have authority to award mildly [sic], non-compensatory fines in appropriate circumstances");

In re Dickerson, 510 B.R. 289, 298 (Bankr. D. Idaho 2014) ("in general, punitive damages are not an appropriate remedy for § 105(a) contempt proceedings, [but] relatively mild noncompensatory fines may be acceptable in some circumstances"). Other courts have held that a bankruptcy court may award "punitive damages," so long as the amount is "relatively mild." See, e.g., Rosales v. Wallace (In re Wallace), BAP No. NV-11-1681-KiPaD, 2012 WL 2401871, at *8 (9th Cir. BAP June 26, 2012) (recognizing that, under Dyer, "such punitive sanctions cannot be 'serious' "). We do not see any meaningful difference between "punitive damages" and "noncompensatory fines." The Ninth Circuit has authorized "noncompensatory *789 fines," which are simply punitive damages by another name. However labeled, any such award must be "relatively mild."[12]

It was thus an error for the bankruptcy court to preclude itself from considering an award of punitive damages. We do not hold that the bankruptcy court must award a fine or punitive damages, but we remand so that the bankruptcy court can consider whether to do so.

[29] [30] Alternatively, the bankruptcy court might choose to issue proposed findings and a recommended judgment on punitive damages to the district court or refer the matter to the district court for criminal contempt proceedings. See, e.g., Exec. Benefits Ins. Agency v. Arkison, –––U.S. ––––, 134 S.Ct. 2165, 2173, 189 L.Ed.2d 83 (2014) (When faced with "core" claims that cannot be adjudicated by the bankruptcy court under Stern v. Marshall, 564 U.S. 462, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011), "[t]he bankruptcy court should hear the proceeding and submit proposed findings of fact and conclusions of law to the district court for de novo review and entry of judgment."); In re Dyer, 322 F.3d at 1194 n.17 ("We do not preclude the possibility that a bankruptcy court could initiate criminal contempt proceedings by referring alleged contempt to the district court. Nor do we address whether the district court could refer those proceedings back to the bankruptcy court if the parties so consented."). The restriction on the bankruptcy court's power to grant punitive damages and punish contempt stems from the fact that bankruptcy judges lack life tenure. District judges do not face that restriction. See In re Dyer, 322 F.3d at 1194.

## CONCLUSION

For the foregoing reasons, the bankruptcy court did not err in awarding the Marinos damages for Ocwen's willful violations of the discharge injunction but erred when it held that it lacked the authority to award any punitive damages. We therefore AFFIRM IN PART and VACATE and REMAND IN PART the Sanctions Order and AFFIRM the Reconsideration Order.

**All Citations**

577 B.R. 772, Bankr. L. Rep. P 83,191, 18 Cal. Daily Op. Serv. 10,658, 2017 Daily Journal D.A.R. 12,223

Footnotes

\*   The Honorable Maureen A. Tighe, U.S. Bankruptcy Judge for the Central District of California, sitting by designation.

1   Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532, all "Rule" references are to the Federal Rules of Bankruptcy Procedure, and all "Civil Rule" references are to the Federal Rules of Civil Procedure.

In re Marino, 577 B.R. 772 (2017)
Bankr. L. Rep. P 83,191, 18 Cal. Daily Op. Serv. 10,658...

2  Mr. Marino later attested that they had moved out of the Property in late 2011. When they filed their bankruptcy petition in 2013, the Marinos were living in Reno, Nevada. They have since moved to Auburn, California.

3  In their moving papers, the Marinos only mentioned the written correspondence, not telephone calls.

4  Before charging for force-placed insurance, a servicer must:
   (i) Deliver to a borrower or place in the mail a written notice containing the information required by paragraph (c)(2) of this section at least 45 days before a servicer assesses on a borrower such charge or fee;
   (ii) Deliver to the borrower or place in the mail a written notice in accordance with paragraph (d)(1) of this section ....

5  12 U.S.C. § 2609(b) states:
   Notification of shortage in escrow account. If the terms of any federally related mortgage loan require the borrower to make payments to the servicer ... of the loan for deposit into an escrow account for the purpose of assuring payment of taxes, insurance premiums, and other charges with respect to the property, the servicer shall notify the borrower not less than annually of any shortage of funds in the escrow account.

6  A debt collector shall send the consumer a written notice stating:
   (1) the amount of the debt;
   (2) the name of the creditor to whom the debt is owed;
   (3) a statement that unless the consumer, within thirty days after receipt of the notice, disputes the validity of the debt, or any portion thereof, the debt will be assumed to be valid by the debt collector;
   (4) a statement that if the consumer notifies the debt collector in writing within the thirty-day period that the debt, or any portion thereof, is disputed, the debt collector will obtain verification of the debt or a copy of a judgment against the consumer and a copy of such verification or judgment will be mailed to the consumer by the debt collector; and
   (5) a statement that, upon the consumer's written request within the thirty-day period, the debt collector will provide the consumer with the name and address of the original creditor, if different from the current creditor.

7  A mortgagee shall file a notice of default that includes the following information:
   (A) A statement identifying the mortgage or deed of trust by stating the name or names of the trustor or trustors and giving the book and page, or instrument number, if applicable, where the mortgage or deed of trust is recorded or a description of the mortgaged or trust property.
   (B) A statement that a breach of the obligation for which the mortgage or transfer in trust is security has occurred.
   (C) A statement setting forth the nature of each breach actually known to the beneficiary and of his or her election to sell or cause to be sold the property to satisfy that obligation and any other obligation secured by the deed of trust or mortgage that is in default.

8  "A mortgage servicer shall contact the borrower in person or by telephone" prior to recording a notice of default or, if not possible, it must send written correspondence.

9  A mortgage servicer that offers foreclosure prevention alternatives shall send a written communication to the borrower that includes:
   (1) That the borrower may be evaluated for a foreclosure prevention alternative or, if applicable, foreclosure prevention alternatives.
   (2) Whether an application is required to be submitted by the borrower in order to be considered for a foreclosure prevention alternative.
   (3) The means and process by which a borrower may obtain an application for a foreclosure prevention alternative.

10 Ocwen does not argue on appeal that the court erred in finding that the calls violated the discharge injunction. While we note that California state law requires the creditor to attempt to contact the debtor concerning the default, see Cal. Civ. Code § 2923.5, the only evidence in the record about the content of the phone calls is the Marinos' and Ms. O'Kane's testimony about repeated demands for payment. There is no evidence that the content of the calls complied with the state statutes. Ocwen did not offer a script that it requires its staff to use or any other evidence of what its staff said during the calls. Rather, it appears that the calls simply and repeatedly demanded payment post-discharge. Nor does it appear that a so-called "mini-Miranda warning," if given, would bring Ocwen's telephone calls into compliance, inasmuch as the FDCPA generally does not apply to foreclosure proceedings.

11 Ocwen cites In re Martinez, 561 B.R. 132, 173 (Bankr. D. Nev. 2016), for the proposition that a "$1,000 per violation figure can be arbitrary as it does not take into account the circumstances of the individual victim, and therefore, would not compensate for the actual damages suffered." But the Martinez court also stated that "[a] $1,000 per violation figure can be too high in some cases, but too low in others. Repeated attempts by a creditor to collect a discharged debt may cause little concern to an individual who is represented by effective bankruptcy counsel, but may be gut wrenching to a pro se debtor who thought he had received a fresh start." Id. at 173 n.47. In this case, the bankruptcy court heard

**In re Marino, 577 B.R. 772 (2017)**
Bankr. L. Rep. P 83,191, 18 Cal. Daily Op. Serv. 10,658...

testimony from the Marinos about how Ocwen's violations affected them. The court's award did "take into account the circumstances of" the Marinos.

12   The Ninth Circuit left open the question of what is a "serious" punitive sanction but implied that any fine above $5,000 (presumably in 1989 dollars) would be considered "serious." In re Dyer, 322 F.3d at 1193 (citing F.J. Hanshaw Enters., Inc. v. Emerald River Dev., Inc., 244 F.3d 1128, 1139 n.10 (9th Cir. 2001)).

---

End of Document                                          © 2020 Thomson Reuters. No claim to original U.S. Government Works.