WRIGHT, FINLAY & ZAK, LLP
Darren T. Brenner, Esq.
Nevada Bar No. 8386
Ramir M. Hernandez, Esq.
Nevada Bar No. 13146
7785 W. Sahara Avenue, Suite 200
Las Vegas, Nevada 89117
(702) 475-7964; Fax: (702) 946-1345
rhernandez@wrightlegal.net
*Attorneys for PHH Mortgage Corporation formerly known as Ocwen Loan Servicing, LLC*

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| IN RE: | Case No.: 13-50461-BTB |
| CHRISTOPHER MICHAEL MARINO, and VALERIE MARGARET MARINO, | Chapter 7 |
| Debtors | **AMENDED MOTION FOR RELIEF FROM JUDGMENT OR ORDER (RULE 9024) AND FOR NEW EVIDENTIARY HEARING** |
| | **Hearing Date:  December 9, 2020** **Hearing Time:  2 p.m.** |

PHH Mortgage Corporation, formerly known as Ocwen Loan Servicing, LLC ("PHH" or "Ocwen"), by and through its counsel of record, Wright, Finlay & Zak, LLP, hereby files this Motion for Relief from Judgment or Order pursuant to Rule 9024 of the Federal Rules of Bankruptcy Procedure ("FRBP") and requests an evidentiary hearing thereon.

This Motion is based on the pleadings and papers on file with this Court, facts subject to judicial notice, and such other and further evidence and argument as this Court might consider.

## I.  INTRODUCTION

On July 5, 2016, this Court sanctioned Ocwen $119,000 for allegedly violating the post-discharge injunction by making various written and telephonic communications to Debtors ("Contempt Order"). Ocwen testified and presented evidence that its contacts with Debtors were

required by law and were made to enforce its *in rem* rights against the property securing the loan. However, in its order granting sanctions, the Court appears to have disregarded that testimony and instead applied a standard akin to strict liability. Specifically, the Court found that Ocwen's communications *must have* been intended to collect a debt from Debtors personally that Ocwen knew had been discharged. This was not the correct standard either at the time (under then controlling Ninth Circuit precedent, the test was the *creditor's* subjective, good faith belief[1]) or as was subsequently established by the U.S. Supreme Court's decision in *Taggart v. Lorenzen*, 587 U.S. ___, 139 S. Ct. 1795, 1804 (2019). Accordingly, PHH moves to vacate the sanctions order and requests a new evidentiary hearing under the correct standard of review.

As held in *Taggart*, the correct standard for holding a creditor in civil contempt for attempting to collect on a debt that has been discharged in bankruptcy is whether "there is no fair ground of doubt as to whether the [discharge] order barred the creditor's conduct." *Taggart* cautioned that contempt is a "severe remedy" and principals of fairness mean that parties must have explicit notice as to what conduct is prohibited before being held in civil contempt.[2] The High Court made clear the appropriate standard is an *objective* one.[3]

Thus, under the *Taggart* standard, this Court should have considered whether, using an *objective* standard: (1) Ocwen's communications could not have been found to be permissible under—if not required by--the applicable State or Federal law, and (2) Ocwen's communications could not have been made for purposes other than seeking to personally collect on the Loan from the Debtors. Moreover, as also held in *Taggart*[4], the amount awarded in the event of any violation should have been mitigated by this Court's consideration of Ocwen's *subjective* intent in making the communications. Something else this Court does not appear to have done.

Accordingly, Ocwen asks that the Court vacate the Contempt Order and subsequent fee award. Further, Ocwen also requests a new evidentiary hearing so that this Court may consider

---

[1] *In re Taggart,* 548 B.R. 275 (B.A.P. 9th Cir. 2016), aff'd, 888 F.3d 438 (9th Cir. 2018)*, vacated and remanded sub nom. Taggart v. Lorenzen,* 139 S. Ct. 1795, (2019).
[2] *Taggart,* 139 S. Ct. at 1802.
[3] *Id,* at 1800-01.
[4] *Id,* at 1802.

the evidence under the correct *Taggart* standard and enter a judgment consistent with that standard.

## II. STATEMENT OF FACTS

1. Debtors purchased the real property commonly known as 780 Beaver Creek Circle, Verdi, California ("Property"), borrowing $325,000.00 ("Loan"), the repayment of which amount was secured by a first Deed of Trust recorded against the Property.

2. PHH, then known as Ocwen, serviced the Loan.

3. On March 15, 2013, Debtors filed a voluntary Chapter 7 bankruptcy petition in the United States Bankruptcy Court for the District of Nevada.[5]

4. The Debtors indicated in their bankruptcy schedule in their petition that they would surrender the Property but never took any steps to do so.[6]

5. On June 18, 2013, Debtors received a discharge.[7]

6. On November 19, 2015, Debtors moved to reopen their bankruptcy and for sanctions for Ocwen's alleged violations of the discharge. Specifically, Debtors alleged that Ocwen sent them correspondence which violated the discharge injunction.[8]

7. Most of the written communications at issue included a bankruptcy disclaimer, for example:

> If you have filed for bankruptcy and your case is still active or if you have received an order of discharge, please be advised that this is not an attempt to collect a pre-petition or discharged debt. Any action taken by OCWEN LOAN SERVICING, LLC is for the sole purpose of protecting our lien interest in your property and not to recover any amounts from you personally. If you have surrendered the property during your bankruptcy case and you are no longer occupying the property, you may disregard this notice. If you are represented by an attorney In a bankruptcy proceeding, you should review this notice and discuss any questions you may have regarding this notice with yow attorney.[9]

8. On February 25 and 26, 2016, the Court held an evidentiary hearing on the

---

[5] ECF No. 1
[6] ECF No. 1 at 45-46.
[7] ECF No. 20.
[8] ECF No. 27.
[9] *See*, **Exhibit A**, Escrow Notice dated November 21, 2014.

Motion for Sanctions.  During the hearing on February 25th, Debtors raised for the first time, that Ocwen purportedly also violated the discharged injunction by repeatedly calling Debtors. The only actual evidence Debtors presented to support the existence of these newly claimed violations was Mrs. Marino's testimony that she received approximately 20 calls from Ocwen, most of which she did not even answer.[10] With the exception of one call, Mrs. Marino did not testify as to the content of any of those calls so there was no evidence as to the purpose of those calls.[11]   The Court appears to have determined that there were 100 such calls not from any evidence actually presented but from a question by Debtors' counsel asking if there were between 60 to 100 calls from Ocwen; to which Mrs. Marino merely responded that "there were a lot of calls."[12]   For its part, Ocwen's witness testified that Ocwen made the written communications in an attempt to comply with the requirements of applicable State or Federal law and that it did not intend them to be treated as attempts to collect on the discharged debt as most of the documents included bankruptcy disclaimers.[13]

9.    On July 5, 2016, the Court entered the Contempt Order finding that Ocwen had willfully violated the discharge injunction by sending 19 post-discharge written communications (as to which the Court rejected the sufficiency of the bankruptcy disclaimers on most of them) and by making 100 telephone calls to Debtors.   The Court awarded the Appellants $119,000.00, $1,000 per violation.[14]  However, it denied Debtors' request for punitive damages.[15]

10.    The Court subsequently awarded Debtors' counsel attorney's fees and costs in the amount of $34,955.90.[16]

11.    On June 19, 2016, Ocwen filed a Motion for Reconsideration of the Contempt

---

[10] **Exhibit B**, Trans. of Hearing on February 25, 2016 at 150:7-151:21.
[11] Debtors' witness, Bernadette O'Kane, also testified to having answered an unspecified number of calls to the Debtors but she did not identify the calls as coming from Ocwen and did not provide details of the content other than to vaguely refer to them as demands for payment. **Exhibit B**, Trans. of Hearing on February 25, 2016 at 90:23-91:18.
[12] *Id.* at 150:4-6.
[13] *Id.* at 101:24-102:12.
[14] ECF No. 60.
[15] *Id.*
[16] ECF No. 126.

1 wherein Ocwen presented evidence of the true number of phone calls Ocwen made.  On

2 September 15, 2016, the Court denied the Motion.[17]

3      12.    Ocwen timely appealed the Contempt Order to the BAP, asserting that the

4 bankruptcy court's findings were erroneous and that the bankruptcy court had erred in denying

5 the Motion for Reconsideration.[18]

6      13.    Appellants filed a cross-appeal, arguing that the bankruptcy court erred in

7 believing it could not award punitive damages in addition to the $119,000 award (the "Cross-

8 Appeal").[19]

9      14.    On December 22, 2017, the BAP affirmed the Contempt Order against Ocwen

10 and the denial of the Motion for Reconsideration but reversed and remanded the bankruptcy

11 court's finding that it could not award punitive damages against Ocwen ("BAP Order").[20]

12      15.    Ocwen subsequently appealed the BAP Order to the Ninth Circuit.[21]

13      16.    In the meantime, Debtors filed a Motion seeking to recover appellate attorney fees

14 of $16,950.00 with the BAP.  The BAP denied that Motion on July 3, 2018, and Debtor appealed

15 that Order to the Ninth Circuit.

16      17.    After briefing and oral argument, the Ninth Circuit issued a published opinion, *In

17 re Marino*, (2020) 949 F.3d 483, wherein it dismissed Ocwen's appeal of the BAP Order for lack

18 of jurisdiction because the BAP's decision remanding the Ocwen First Appeal for a decision on

19 punitive damages was not a final, appealable order, noting that *the bankruptcy court needed to*

20 *make further findings of fact concerning the punitive damages sought by Debtors*.[22]  The Ninth

21 Circuit also denied the Debtors Appeal, affirming the BAP's decision denying Debtors their

22 attorney's fees on appeal.[23]  Debtors' Motion for *en banc* rehearing of that denial was also

23

24 _____

25 [17] ECF No. 107.

[18] *Cf.* ECF No. 13 in BAP App., Case 16-1229.

26 [19] *Cf.* ECF No. 27-1 in BAP App., Case 16-1229.

[20] *Cf.* ECF No. 44 in BAP App., Case 16-1229.

27 [21] ECF No. 54.1 in BAP App., Case 16-1229

[22] *Id.* at 487-88.

28 [23] ECF No. 34 in 9th Cir. App., Case No. 18-60040.

denied.[24] On September 24, 2020, Debtors filed a petition for certiorari to the U.S. Supreme Court on that issue, which has yet to be accepted for review.

18.     On September 8, 2020, the bankruptcy court reopened the bankruptcy case.[25]

19.     On September 15, 2020, Debtors filed a Motion to Determine Punitive Damages, which will be heard on December 9, 2020 or February 19, 2021.[26]

### III. LEGAL STANDARD

FRBP 9024 applies Rule 60 of the Federal Rule of Civil Procedure to motions for relief from bankruptcy court judgments.  FRCP 60(b) provides:

> (b) Grounds for Relief from a Final Judgment, Order, or Proceeding. On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:
>
>  (5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or
> (6) any other reason that justifies relief.

In a Rule 60 Motion, a movant must not merely reassert his or her previous contentions.[27] Instead, a movant must present new evidence, ***identify a change in controlling law***, or identify a clear error.[28]  Here, the U.S. Supreme Court's decision in *Taggart* constitutes a change in controlling law and demands reconsideration of the evidence under the new standard of review. Although *Taggart* was handed down while this case was on appeal, the decisions of the Supreme Court are generally treated as retroactive as to any pending case.[29] Here, the case is still pending

---

[24] ECF No. 42 in 9th Cir. App., Case No. 18-60040

[25] ECF No. 155.

[26] ECF No. 157.

[27] *See*, *Nunes v. Ashcroft*, 375 F.3d 805, 808 (9th Cir. 2004).

[28] *Id.*

[29] *Harper v. Virginia Dept. of Taxation*, 509 U.S. 86, 97 (1993)("When this Court applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate our announcement of the rule.");  *see also In re Freeman*, (B.A.P. 9th Cir. 2019) 608 B.R. 228, 233-34 (applying *Taggart* standard to review of propriety of bankruptcy court's order on contempt motion under prior standard).

while waiting for a final judgment following the Court's ruling on the punitive damage portion of the case.  As such, Rule 60 relief is appropriate and Ocwen requests that the Court vacate the Contempt Order, subsequent fee award and hold a new evidentiary hearing where it evaluates the evidence under the correct standard.

## IV. **LEGAL ARGUMENT**

### A.  The U.S. Supreme Court Held in *Taggart* that Discharge Injunction Violations Must be Evaluated Under an Objective Standard, which this Court did Not Apply.

After this Court issued the Contempt Order (July 5, 2016), and while this matter was pending before the Ninth Circuit, the U.S. Supreme Court handed down its decision in *Taggart, supra*, expressly rejecting *both* (a) the prior, controlling, subjective standard for discharge violations in the Ninth Circuit under *In re Taggart*[30] and (b) the alternative standard, which was "akin to strict liability," urged by Debtor's counsel and applied by the bankruptcy court in finding the creditor in contempt.[31]

The BAP's *Taggart* ruling, handed down on April 12, 2016, began with the established precedent that a two-part test is required to prove a discharge violation:  (1) the creditor knew the discharge injunction was applicable and (2) the creditor intended the actions which violated the injunction.  "This standard requires evidence showing the alleged contemnor was aware of the discharge injunction and aware that it applied to his or her claim.  Whether a party is aware that the discharge injunction is applicable to his or her claim is a fact-based inquiry ***which implicates a party's subjective belief, even an unreasonable one***."[32]  The Court concluded that "each prong of the Ninth Circuit's two-part test for a finding of contempt in the context of a discharge violation requires a different analysis, and distinct, clear, and convincing evidence supporting that analysis, before a finding of willfulness can be made."[33]  Ultimately, the BAP reversed the lower court's decision because it applied the wrong standard in determining whether the creditor

---

[30] *In re Taggart*, 548 B.R. 275, 286 (B.A.P. 9th Cir. 2016), *aff'd*, 888 F.3d 438 (9th Cir. 2018), vacated and remanded sub nom. *Taggart v. Lorenzen*, 139 S. Ct. 1795, (2019).
[31] *Taggart v. Lorenzen*, *supra*, at 1799 (2019).
[32] *In re Taggart, supra,* at 288 (emphasis added).
[33] *Id.* (internal citations omitted).

"had the sort of actual knowledge necessary for a finding of willfulness."[34]  This case was the controlling precedent when this Court entered its Contempt Order on July 5, 2016.  However, it does not appear to be the standard that this Court applied, rather this Court's decision seemed to look to the *Debtors'* subjective belief and to treat the test as one akin to strict liability.  In doing so, the Court disregarded Ocwen's evidence as to why it made the communications and whether they could objectively have been thought to be required by law.  Regardless, this Court did not apply the correct standard under the *either* iteration of the *Taggart* test.

The Ninth Circuit thereafter affirmed the BAP's *Taggart* decision and held that the creditors had a good faith belief that the discharge injunction did not apply to them.[35]

The U.S. Supreme Court reversed the prior BAP and Ninth Circuit rulings and held that the prior rulings applying a subjective standard for civil contempt were erroneous *as was the bankruptcy court's application of a standard akin to strict liability*.[36]  Instead, the only proper standard to apply is an **objective one**.[37]  In expressly rejecting the bankruptcy court (and the Debtor's) assertion that a standard akin to strict liability was appropriate, the Supreme Court observed (among other things) that:

> The purposes of automatic stays and discharge orders also differ: A stay aims to prevent damaging disruptions to the administration of a bankruptcy case in the short run, whereas a discharge is entered at the end of the case and seeks to bind creditors over a much longer period. These differences in language and purpose sufficiently undermine Taggart's proposal to warrant its rejection.[38]

Instead, the Court held that "[a] court may hold a creditor in civil contempt for violating a discharge order where there is not a "fair ground of doubt" as to whether the creditor's conduct might be lawful under the discharge order."[39]  However, the Court also expressly noted that a

---

[34] *Id.* at 290.
[35] *In re Taggart*, *supra,* 888 F.3d at 444).
[36] *See*, *Taggart v. Lorenzen*, *supra*, at 1799: "We conclude that neither a standard akin to strict liability nor a purely subjective standard is appropriate."
[37] *Id.* at 1802, 1804.
[38] *Id.* at 1804.  The Court also rejected as unworkable the suggestion of Debtor's counsel that a creditor could always seek an advance determination from the bankruptcy court as to whether proposed conduct would violate the discharge injunction.  *Id.*  at 1803.
[39] *Id.* at 1804.

party's subjective intent is relevant to determine the appropriate sanction even when the offending party acted in an objectively unreasonable manner.[40]   This Court did not apply this standard either.   As stated before, this Court adopted a strict liability standard that the Supreme explicitly rejected.

In light of the *Taggart* decision, this Court clearly used the incorrect standard in granting the Contempt Order and awarding $119,000 to Debtor.   Relief is requested to remedy that error.

**B. Rule 60 Relief is Necessary and Proper Under the Circumstances..**

As explained below in greater detail, Ocwen's request for relief is timely and appropriate under *both* Rule 60(b)(5) and (6).

**1.   An Intervening and Material Change in Governing Law is Sufficient to Warrant Relief Under Rule 60(b)(5) and (6).**

Subsections 5 and 6 of FRCP 60 provide <u>independent</u> grounds to grant relief from judgment where, as here, there has been a material change in the governing case law.

According to the U.S. Supreme Court, Rule 60(b)(5) relief is proper where applying the existing judgment prospectively is no longer equitable.[41]   "[T]he Rule provides a means by which a party can ask a court to modify or vacate a judgment or order if 'a significant change either in factual conditions or in law' renders continued enforcement 'detrimental to the public interest.'"[42]

Furthermore, relief under Rule 60(b)(6) is proper when material changes in the governing law provide sufficient grounds for granting relief from judgment.[43]   Specifically, the court "is to evaluate the circumstances surrounding the specific motion before the court."[44]   This necessitates that the Court "intensively balance numerous factors, including the competing policies of the finality of judgments and the incessant command of the court's conscience that justice be done in

---

[40] *Id.* at 1802:  "On the flip side of the coin, a party's good faith, even where it does not bar civil contempt, may help to determine an appropriate sanction." (internal citations *omitted*).
[41] *See*, *Horne v. Flores*, 557 U.S. 433, 447;129 S. Ct. 2579, 2593 (2009).
[42] *Id.* (internal citations omitted).
[43] *See*, *Phelps v. Alameida*, 569 F.3d 1120, 1133 (9th Cir. 2009)
[44] *Id.*

9

light of all the facts."[45]

### 2. The Motion is Timely.

Rule 60(c) provides that a subsection (b) motion for relief must be made within a reasonable time and, when moving under subsections (b)(4)-(b)(6), there is no stated time limit for filing the motion.  Here, the motion was filed within a reasonable time since the *Taggart* decision was issued in 2019 and the bankruptcy was just reopened on September 8, 2020.

Furthermore, intervening changes in the case law should be applied where a final judgment has not been entered.[46] Thus, the instant motion is *per se* timely because as the Ninth Circuit made clear in dismissing Ocwen's appeal, the Court has not entered a final judgment in this matter.[47]

### 3. Relief is Appropriate under Rule 60(b)(5) because of the Intervening Change in Case Law.

The law of this Circuit is clear that intervening case law is to be applied prior to entry of a final judgment.[48]    Further, in *Horne v. Flores*, the U.S. Supreme Court held that a significant change in law is sufficient cause to grant relief from judgment under FCRP 60(b)(5).[49]  *Taggart* represents a significant change in the standard for determining contempt in discharge violation cases.   Whereas, before the Supreme Court's decision in *Taggart,* a bankruptcy court was supposed to consider the creditor's subjective intent (even if unreasonable) in deciding whether an alleged discharge injunction violation was a contempt, but some bankruptcy courts nonetheless applied a standard akin to strict liability.  As a result of *Taggart,* bankruptcy courts must now consider (1) whether "there is no objectively reasonable basis for concluding that the creditor's conduct might be lawful"[50]; and (2) how the party's subjective intent should affect the

---

[45] *Id.* (citing to *Stokes v. Williams*, 475 F.3d 732, 736 (6th Cir. 2007)).

[46] *See*, *Wasserman v. Mun. Court of Alhambra Judicial Dist.*, 543 F.2d 723, 725 (9th Cir. 1976)("So long as the case is *sub judice*, a federal court must apply a new and supervening rule of federal law when applicable to the issues in the case.").

[47] *See* fn. 19, *supra.*

[48] *See*, *Wasserman*, 543 F.2d at, 725, *supra.*

[49] *Supra,* 557 U.S. at 447; 129 S. Ct. at 2593.

[50] *Taggart v. Lorenzen, supra,* at 1799.

amount of damages.[51]

The record from the previous evidentiary hearing, as well as the Contempt Order, is bereft of any finding that Ocwen's conduct at issue was objectively unreasonable or that Ocwen's subjective intent warranted damages. To the contrary, the Court's findings suggest an approach akin to strict liability, as if this were a violation of the automatic stay rather than of the discharge injunction. Indeed, the transcript from the hearing reflects that this Court adopted *Debtors' subjective belief* that Ocwen had only one purpose in mind for sending the letters and phone calls *but provides no evidence from the record as to that intent*:

> Ocwen could not have been doing anything but trying to get the debtor to give them some more money, either for insurance or agree to be responsible for the house that was vacant, even after they had -- even after Ocwen had – received stay relief. I think that Ocwen, rather than foreclose on the property, which they could have done approximately six -- well, approximately three months after the case was filed, waited two years to foreclose, hoping that if they sent enough letters and gave enough calls, that the debtor would ultimately pay them some money for something. That's all I can think.[52]

There was no finding from the Court that there was "no a fair ground of doubt" that Ocwen's conduct might be lawful. Further, there was no consideration of the evidence Ocwen presented to support that it had an objectively reasonable basis for believing that its communications to Debtors were required under applicable law and contained appropriate disclaimers.[53]    The

---

[51] *Id,* at 1802.

[52] *See* **Exhibit C**, Trans. of Hearing on June 20, 2016 at 7:10-19.  As held in *In re Cantrell,* 605 B.R. 841, 859 (Bankr. W.D. Mich. 2019), debtor bears the "burden of proving that the phone calls placed by [creditor] to the Debtor were attempts to collect the mortgage debt in violation of the discharge injunction" and not for some other purpose.

[53] *See* **Exhibit B**, Trans. of Hearing on February 25, 2016 at 101-02:24-12, 110: 8-16, 126:6-15 . *See also In re Roth,* 935 F.3d 1270, 1276-78 (11th Cir. 2019)("The *Taggart* standard is a rigorous one: in order to find that sanctions are appropriate here, we would have to hold that 'there is no objectively reasonable basis for concluding that [Creditor's] conduct might be lawful.'"  Holding test did not permit finding the communications at issue to be a violation).  As noted above, *Taggart, supra,* at 1803, rejected Debtor's counsel's argument that a creditor could always ask the bankruptcy court for an advance determination as to whether its proposed conduct would violate the discharge injunction, so objectively reasonable grounds cannot be negated where there is a statutory or judicial basis indicating that the creditor's conduct was permissible.

1    absence of such a finding has been held to be reversible error in light of *Taggart*.[54]

2        So what does that mean for this litigation?  The material effect of *Taggart* is that the

3 Court should consider the following questions in light of the facts before entering a final order:

4 1) whether Ocwen was aware of the discharge injunction (a fact not in dispute); 2) whether

5 Ocwen's conduct in making each of the communications was objectively improper with no fair

6 grounds for those communications to have been considered proper; and 3) the degree to which

7 Ocwen's subjective belief that it was not acting in violation of the discharge injunction should

8 impact the amount of the sanctions award.  In the evidentiary hearing on this matter, the Court

9 accepted the evidence Debtors presented and assumed (in part based on *Debtors'* subjective

10 belief) that each of the communications were made for the prohibited purpose of trying to collect

11 on the Loan from Debtors' personally, rather than for the permissible purpose of enforcing

12 Ocwen's *in rem* rights.  The Court did *not* consider, or disregarded, whether the post-discharge

13 correspondence and the phone calls objectively constituted a discharge violation in light of the

14 foreclosure status of the loan.  It is well-established law that a creditor has the right to enforce its

15 *in rem* rights to property of the estate and to send communications to the Debtor to that effect.[55]

16 And in enforcing those *in rem* rights, Ocwen was bound to follow state foreclosure law.[56] Such

17 an objective review invariably requires the Court to consider the content and purpose of each and

18 every written notice Ocwen sent and each every phone call Ocwen made that Debtors placed in

19

20

21

---

22 [54] *Fidelity and Deposit Company of Maryland v. TRG Venture Two, LLC,* 2019 WL 5208853 at

23 *6 (N.D. Ill., E.D.. Oct. 16, 2019).

[55] *See*, *Johnson v. Home State Bank*, 111 S. Ct. 2150, 2154 (1991)("Rather, a bankruptcy

24 discharge extinguishes only one mode of enforcing a claim—namely, an action against the

25 debtor *in personam*—while leaving intact another—namely, an action against the debtor in

rem.); *also*, *In re Cantrell*, 605 B.R. 841, 853 (Bankr. W.D. Mich. 2019)("In such instances, the

26 discharge injunction in § 524(a)(2) does not prohibit all communications between the secured

creditor and the debtor, but only enjoins any actions and communications designed to "collect,

27 recover or offset" the debt as a "personal liability of the debtor.").

[56] *See*, *In re Gill*, 529 B.R. 31, 37 (Bankr. W.D.N.Y. 2015)("A secured creditor's "right to

28 foreclose on the mortgage survives or passes through the bankruptcy" and remains enforceable

under state law.")(citing to *Johnson*, 501 U.S. at 83, 111 S.Ct. 2150).

1    issue.[57]

2        Instead, the Court just made the blanket determination that Ocwen had sent the notices

3    and made the communications for one purpose, to collect on the debt against Debtors personally,

4    without considering whether, from an objective perspective, there were no fair grounds for

5    finding that there might have been a different purpose for the communications that would not be

6    in violation of the discharge injunction.  This is particularly true of the phone calls.  Debtors did

7    not introduce evidence as to the content of each phone call, let alone the total number of calls—

8    in fact, Debtors' counsel specifically stated that: "I don't want to go through each one."[58]  Nor

9    did Debtors provide any evidence to meet their burden of showing by clear and convincing

10    evidence that each call objectively violated the discharge injunction.  Debtors only testified to

11    receiving a total of 20 calls (most of which do not appear to have been answered by Debtors)

12    and, even then, only gave evidence as to the content of one of those calls.[59]  The Court just

13    accepted Debtors' counsel's *question* as to whether there had been 60-100 calls made as

14    evidence that there *must have been* 100 calls and just <u>assumed</u> that *all* the calls must have all

15    been made for an improper purpose.  Under the requirements of *Taggart*, Debtors' evidence of

16    the phone calls was woefully insufficient to support the Court's conclusion.  In order to conduct

17    a proper objective analysis, this Court needs to make a determination as to the precise number of

18    calls made and the purpose(s) for which *each* call was made in order to correctly determine

19    whether any of them violated the discharge injunction.

20        As to the written communications, *in rem* collection correspondence for real property is

21    allowed under 12 U.S.C. §524(j), which states that a discharge violation does not occur when:

22    (1) such creditor retains a security interest in the real property that is the principal residence of

23

24    [57] *See*, *In re Taggart*, 548 B.R. 275, 288 (B.A.P. 9th Cir. 2016), <u>aff'd</u>, 888 F.3d 438 (9th Cir.
2018), vacated and remanded sub nom. *Taggart v. Lorenzen*, 139 S. Ct. 1795

25    (2019)("Accordingly, each prong of the Ninth Circuit's two-part test for a finding of contempt in
the context of a discharge violation requires a different analysis, and distinct, clear, and

26    convincing evidence supporting that analysis, before a finding of willfulness can be made.")
This intensive analysis requirement was not overturned by the Supreme Court in *Taggart* and the

27    record here is bereft of any such analysis.

28    [58] *See* **Exhibit B**, Trans. of Hearing on February 25, 2016 at 150:4-9.
      [59] *See* **Exhibit B**, Trans. of Hearing on February 25, 2016 at 150-52:4-11.

the debtor; (2) such act is in the ordinary course of business between the creditor and the debtor; and (3) such act is limited to seeking or obtaining periodic payments associated with a valid security interest in lieu of pursuit of in rem relief to enforce the lien.    In addition, communications required to be sent by law are supposed to be exempt.[60]    Several courts have found that the bankruptcy disclaimer in a mortgage statement, similar to the ones found in this case, is sufficient to avoid a discharge injunction violation if such statements are not a demand for payment but merely for information purposes.[61]    As with the phone calls, the Court did not consider the objective basis for each written communication, nor whether each communication was exempt from the injunction under §524(j).    At this point, this Court does not have sufficient evidence before it, based on the existing record, to make the requisite finding whether there is "no fair ground of doubt" that Ocwen's conduct was prohibited by the discharge injunction The Court requires additional facts and evidence and a new evidentiary hearing to properly evaluate Ocwen's conduct—and its intent—under the *Taggart* test.

The Court thus also needs to reevaluate whether its award of damages to Debtor in the amount of $1,000.00 per violation was appropriate.[62]    In making that award, the Court did not analyze or weigh Ocwen's subjective intent, as required under *Taggart*.    This, too, reflects the need for a new evidentiary hearing.

The Contempt Order is indisputably not consistent with the superseding case law.    The procedural posture of this case—where no final judgment has been entered—requires vacating

---

[60] *In re Garske*, (9th Cir. BAP 2002) 287 B.R. 537, 543.

[61] *See e.g.*, *In re McConnie Navarro*, 563 B.R. 127, 147 (Bankr. D.P.R. 2017)("Thus, for these reasons, the court finds that [the secured creditors] in sending the monthly mortgage statements did not violate the discharge injunction since they did not demand payment nor were an attempt to collect a debt from the Debtor personally."); *In re Mele*, 486 B.R. 546, 557 (Bankr. N.D. Ga. 2013)("The Court finds that the Account Statement sought to provide information to Plaintiff, post discharge, to facilitate retention of her home and was not an attempt to collect a debt from Plaintiff personally."); *In re Bates*, 517 B.R. 395, 400 (Bankr. D.N.H. 2014), aff'd sub nom. Bates v. CitiMortgage, Inc., 550 B.R. 12 (D.N.H. 2016), *aff'd*, 844 F.3d 300 (1st Cir. 2016)("Accordingly, the Court finds that the letter in question, and the Loan Modification Agreement itself, come within the provisions of the contact permitted post-discharge under § 524(j).").

[62] *Id.* at 9:16.18.

14

the prior judgment because a court is bound by intervening, controlling case law where a case is still pending and a final judgment has not yet been entered.[63]  Notably, the BAP has already reversed and remanded one case because the bankruptcy court did not apply the Supreme Court's *Taggart* standard.  In *In re Freeman*, the BAP reversed and remanded a bankruptcy court decision because *Taggart* changed the standard for discharge violations and the bankruptcy court's prior ruling did not apply the correct test.[64] In light of the material change in the appropriate standard of review created by the Supreme Court's *Taggart* ruling, this Court should vacate and reconsider its Contempt Order pursuant to the authority under FRCP 60(b)(5).

### 4.  Alternatively, Relief under Rule 60(b)(6) is Warranted.

Relief under Rule 60(b)(6) is also be appropriate under the circumstances.  Although generally a catch-all for relief from judgment not previously covered, this subsection has been applied in instances where there has been an intervening, material change in the governing case law.[65]  In such cases, the Court is to evaluate the circumstances surrounding the case and balance numerous factors, including the finality of the judgment with the competing concern that justice be done.[66]  As the Ninth Circuit recently explained in *Henson v. Fidelity National Financial, Inc.*:

> We have previously recognized that a change in the controlling law can— but does not always—provide a sufficient basis for granting relief under Rule 60(b)(6). *See Phelps*, 569 F.3d at 1132–33. To assess a Rule 60(b)(6) motion "predicated on an intervening change in the law," a district court must "evaluate the circumstances surrounding the specific motion before the court." *Id*. at 1133. This "case-by-case inquiry ... requires the trial court to intensively balance numerous factors, including the competing policies of the finality of judgments and the incessant command of the court's conscience that justice be done in light of all the facts." *Id*.[67]

---

[63] *See*, *Wasserman*, 543 F.2d at 725, fn. 32, *supra*.

[64] 608 B.R. 228, 234 (B.A.P. 9th Cir. 2019)("Given the change in controlling law [*Taggart*], we must vacate the decision and remand for a decision under the standard now required by the Supreme Court.").

[65] *See*, *Phelps*, 569 F.3d at 1133, *supra*.

[66] *Id.*

[67] 943 F.3d 434, 444 (9th Cir. 2019).

The Ninth Circuit held that a *non-exhaustive* list of six factors from *Phelps* should be applied to evaluate whether Rule 60(b)(6) relief was warranted:  (1) the nature of the intervening change in the law; (2) movant's diligence in seeking relief; (3) the parties' reliance interest in the finality of the judgment; (4) the delay between the judgment and the motion; (5) the relationship between the original judgment and the change in the law; and (6) concerns of comity.[68]

As to the first factor, the Supreme Court's decision in *Taggart* indisputably changed the prior standard in the Ninth Circuit for determining whether a creditor violated the discharge injunction. Regardless of which of the two standards this Court *should have* applied in ruling on the contempt motion, it does not appear to have applied either but, instead, adopted a standard akin to strict liability.  As the Ninth Circuit explained: "courts considering this factor should not in rote fashion rely on the conclusion from a different context that any particular type of change in the law favors or disfavors relief. Instead, a district court should weigh whether the specific nature of the change in the law in the case before it makes granting relief more or less justified under all of the circumstances, and should support its conclusion with a reasoned explanation grounded in the equitable considerations raised by the case at bench."[69]  Thus, this factor clearly favors relief.

In terms of the second factor, Ocwen is moving for relief approximately one month after this Court reopened the case.  Ocwen could not have moved for relief until the case was reopened.

The third factor is inapplicable as there has been no final judgment.  Indeed,  as recognized in *Henson, supra*, the requisite reliance is not an abstract concept but turns on "whether 'the final judgment being challenged has caused one or more of the parties to change his legal position in reliance on that judgment' such that granting the motion for relief would 'undo the past, executed effects of the judgment.' [citation omitted]"[70]

---

[68] *Id.* at 446-54 (noting additional factors that should also have been considered in that case).

[69] *Id.* at 446-47.

[70] *Id.* at 450; further observing at 451:  "Because the present case was still pending on appeal when [the Supreme Court case that changed the law] was decided, and was then remanded to the

Although the fourth factor would seem to be somewhat duplicative of the second factor, it would seem to either be inapplicable here, as there was no final judgment, or satisfied for the same reasons as the second factor.  As stated in *Henson, supra*:  "In this case, the judgment never truly became final on appeal, and in any case, [moving parties] moved for relief shortly after the Ninth Circuit remanded the case to the district court."[71]

As to the fifth factor, the Supreme Court's change as to the proper standard of review goes to the very heart of whether the Contempt Order properly found Ocwen to be in contempt. The Ninth Circuit held that: "[This] factor directs courts to examine closely the original and intervening decisions at issue in a particular motion for [Rule 60(b)] relief predicated on an intervening change in the law: if there is 'a close connection between the two cases, the court [will be more likely to] f[i]nd the circumstances sufficiently extraordinary to justify disturbing the finality of the [original] judgment.'"[72]

Comity, the sixth factor, is inapplicable here as there is no concern about any need for comity between independent, sovereign states and the federal courts presented by this case.  The Supreme Court's decision applies to all courts considering contempt for violations of the discharge injunction, not just those in the Ninth Circuit.

As an additional factor warranting relief—no final judgment has been entered.  Thus, this Court can and should reconsider its Contempt Order, and set a new evidentiary hearing to apply the proper standard announced by the Supreme Court in *Taggart*.  As recognized in *Henson, supra,* at 439:  Rule 60(b)(6) "is a grand reservoir of equitable power that allows courts to grant relief from final judgment for 'any' reason that 'justifies relief.' "

All the relevant factors weigh in favor of granting relief.  As such, relief is warranted under Rule 60(b)(5) and (6).

/././

/././

---

district court for further proceedings, [the opposing party] could not reasonably have believed that the dismissal was immutably final."  The same is true of this proceeding.
[71] *Id.* at 452.
[72] *Id.*, quoting *Phelps,* 569 F.3d at 1139.

17

**C. This Court Should Order a New Evidentiary Hearing under the Proper Standard.**

A Rule 60 motion can warrant ordering a new trial or evidentiary hearing.[73]   A new evidentiary hearing is appropriate under the circumstances because this Court appears to have utilized an incorrect standard of review, akin to strict liability, and did not review each of the alleged violations under the correct standard.   Instead, Ocwen's conduct in making each communication needs to be evaluated under the objective "fair grounds" test as required by the Supreme Court's *Taggart* ruling.   In addition, before assessing any damages, Ocwen must be allowed to offer testimony as to its *subjective* intent and belief in sending the written communications at issue and in calling the Debtors so that the Court can determine the proper amount of damages. As it stands now, under the requirements of *Taggart,* this Court does not have sufficient evidence to properly support either the number of violations or the amount of the sanctions—let alone punitive damages--for the 19 written communications and the putative 100 telephone calls referenced in the Contempt Order and thus cannot justify the $119,000.00 award.

In the interest of fairness to the parties, PHH therefore respectfully requests that this Court order a new evidentiary hearing to consider whether there was "no objectively reasonable basis for concluding that the [Ocwen's] conduct might be lawful under the discharge order."   In this regard, PHH notes that an evidentiary hearing would, in any event, be necessary for this Court to properly consider the question of whether punitive damages should be awarded and, if so, the appropriate amount.   Indeed, the need for such fact finding by this Court was expressly part of the basis upon which the Ninth Circuit determined that Ocwen's appeal was not yet ripe and should be dismissed.[74]

/././

/././

---

[73] *See e.g.*, *Parks By & Through Parks v. Collins*, 761 F.2d 1101, 1104 (5th Cir. 1985)(holding that granting a Rule 60 motion is akin to granting a motion for a new trial); *Zurich N. Am. v. Matrix Serv., Inc.*, 426 F.3d 1281, 1289 (10th Cir. 2005)(holding new trial may be ordered under FRCP 60(b)(2));  *Bethel v. McAllister Bros., Inc.*, 81 F.3d 376, 382 fn. 7 (3d Cir. 1996)(court discusses new trial under FRCP 60(b)(3)).
[74] 949 F.3d, *supra*, at 487-88.

# V. **CONCLUSION**

Intervening case law provides this Court grounds to grant PHH's requested relief under FRCP 60(b)(5) or (b)(6).  Because such relief would require the prior judgment to be vacated, PHH respectfully requests that this Court order a new evidentiary hearing so to that court may consider all the evidence on the *Taggart* standard.

Respectfully submitted

Dated: October 22, 2020                             WRIGHT, FINLAY & ZAK, LLP

/s/ *Ramir M. Hernandez, Esq.*
Ramir M. Hernandez, Esq.
Nevada Bar No. 13146
7785 W. Sahara Avenue, Suite 200
Las Vegas, Nevada 89117
(702) 666-0632; Fax: (702) 946-1345
rhernandez@wrightlegal.net
*Attorneys for PHH Mortgage Corporation*
*formerly known as Ocwen Loan Servicing,*
*LLC*

## **CERTIFICATE OF SERVICE**

1.    On October 22, 2020, I served the following document(s):

**AMENDED MOTION FOR RELIEF FROM JUDGMENT OR ORDER (RULE 9024) AND FOR NEW EVIDENTIARY HEARING**

2.    I served the above-named document(s) by the following means to the persons as listed below:

(Check all that apply)

■ a.    ECF System (You must attach the "Notice of Electronic Filing", or list all persons and address and attach additional paper if necessary)

SETH J. ADAMS on behalf of Creditor DEUTSCHE BANK NATIONAL TRUST COMPANY, AS TRUSTEE FOR GMACM MORTGAGE LOAN TRUST
sadams@woodburnandwedge.com, jgoff@woodburnandwedge.com

CHRISTOPHER PATRICK BURKE on behalf of Debtor CHRISTOPHER MICHAEL MARINO
atty@cburke.lvcoxmail.com

CHRISTOPHER PATRICK BURKE on behalf of Debtor CHRISTOPHER MICHAEL MARINO
attycburke@charter.net

CHRISTOPHER PATRICK BURKE on behalf of Joint Debtor VALERIE MARGARET MARINO
atty@cburke.lvcoxmail.com

CHRISTOPHER PATRICK BURKE on behalf of Joint Debtor VALERIE MARGARET MARINO
attycburke@charter.net

W. DONALD GIESEKE
wdg@renotrustee.com, dgieseke@ecf.axosfs.com

RAMIR M. HERNANDEZ on behalf of Creditor PHH MORTGAGE SERVICES, FORMERLY KNOWN AS OCWEN LOAN SERVICING, LLC
rhernandez@wrightlegal.net, jcraig@wrightlegal.net;nvbkfiling@wrightlegal.net

DANA JONATHON NITZ on behalf of Creditor OCWEN LOAN SERVICING LLC
dnitz@wrightlegal.net, nvbkfiling@wrightlegal.net;jcraig@wrightlegal.net

U.S. TRUSTEE - RN - 7
USTPRegion17.RE.ECF@usdoj.gov

■ b.   United States mail, postage fully pre-paid (List persons and addresses.  Attach additional paper if necessary)

CHRISTOPHER MICHAEL MARINO
POB 565
VERDI, NV 89439

VALERIE MARGARET MARINO
POB 565
VERDI, NV 89439

□ c.   Personal Service (List persons and addresses.  Attach additional paper if necessary)

I personally delivered the document(s) to the persons at these addresses:

_____

□   For a party represented by an attorney, delivery was made by handing the document(s) to the attorney or by leaving the document(s) at the attorney's office with a clerk or other person in charge, or if no one is in charge by leaving the document(s) in a conspicuous place in the office.

□   For a party, delivery was made by handing the document(s) to the party or by leaving the document(s) at the person's dwelling house or usual place of abode with someone of suitable age and discretion residing there.

□ d.   By direct email (as opposed to through the ECF System) (List persons and email addresses.  Attach additional paper if necessary)

Based upon the written agreement of the parties to accept service by email or a court order, I caused the document(s) to be sent to the persons at the email addresses listed below.  I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

□ e.   By fax transmission (List persons and fax numbers.  Attach additional paper if necessary)

Based upon the written agreement of the parties to accept service by fax transmission or a court order, I faxed the document(s) to the persons at the fax numbers listed below.  No error was reported by the fax machine that I used.   A copy of the record of the fax transmission is attached.

☐ f.    By messenger (List persons and addresses.  Attached additional paper if necessary)

I served the document(s) by placing them in an envelope or package addressed to the persons at the addresses listed below and providing them to a messenger for service. (A declaration by the messenger must be attached to the Certificate of Service).

I declare under penalty of perjury that the foregoing is true and correct.


Signed on Thursday, October 22, 2020.

/s/   Jason Craig
An employee of Wright, Finlay & Zak, LLP

22

Exhibit A

Exhibit A

Exhibit A



**OCWEN LOAN SERVICING, LLC**
P.O. BOX 659826
SAN ANTONIO, TX 78265-9126
(866) 317-7661
Fax (866) 807-1814

O C W E N

5654 0.9550 MB 0.435      27 5 1                                          NOVEMBER 21, 2014

ᵖᵐᵖᵐᵖᵐᵖᵐᵖᵐᵖᵐᵖᵐᵖᵐᵖᵐᵖᵐᵖᵐᵖᵐᵖᵐᵖ

VALERIE MARINO
CHRISTOPHER MARINO
PO BOX 565
VERDI NV 89439-0565

Subject: **Final notice - Please provide insurance information for**
780 BEAVER CREEK CIR
VERDI, CA 96111

Dear Valerie Marino:

We previously sent you a second and final notice regarding your hazard insurance. We are sending this notice as a reminder that our records show that your hazard insurance expired, and we still do not have evidence that you have obtained new coverage. **Because hazard insurance is required on your property, we plan to buy insurance for your property.** You must pay us for any period during which the insurance we buy is in effect but you do not have insurance.

You should immediately provide us with your insurance information. Please have your insurance agent or carrier include the loan number and property address on a copy of your new/renewal policy or notice of reinstatement and fax it with a Mortgagee Clause/Lender's Loss Payable Endorsement as soon as possible to (866) 807-1814. You/your agent can mail the documents to:

OCWEN LOAN SERVICING, LLC
ITS SUCCESSORS AND/OR ASSIGNS
P.O. BOX 659826
SAN ANTONIO, TX 78265-9126
Attention: ▮▮▮▮▮▮

This information must be provided in writing. Or, you may update your hazard insurance coverage information online at **www.imcovered.com/ocwen1.**

The insurance we buy:

- **Will cost an estimated $1,964.00 annually, which may be more expensive than insurance you can buy yourself.**

- **May not provide as much coverage as an insurance policy you buy yourself.**

If you have any questions, please contact us at (866) 317-7661.

Please review the additional important information contained on the following pages of this transmittal.

Reference #:   **2301**
Unique Identifier #: ▮▮▮▮▮▮

NMLS #: 1852
01 EXPIRED INS LTR 3          F 008

OB0164   012301FBIND39914030101



Valerie Marino

The following information is being provided as additional information. It includes important information about the insurance on your mortgaged property.

- **PURCHASING YOUR OWN INSURANCE:**

  - **You have the right to independently purchase acceptable insurance from the insurance agent or company of your choice and we urge you to do so.** Acceptable insurance is insurance that is equal to 100% of the estimated replacement cost to rebuild your home and other improvements on your property.

    If you have been refused coverage, ask your agent or your state's insurance department whether your state has a Fair Access to Insurance Requirements (FAIR) plan, so that you can try to get the coverage you need.

- **ESCROWING FOR INSURANCE:**

  - *Applicable to Non-Escrow Only*
    Per our records, you have elected to pay your insurance directly, rather than having it paid for you through an escrow account. If you are currently unable to pay your hazard insurance premium, please complete the important attached notice as soon as possible to ask us to set up an escrow account and advance the insurance premium for you. If you choose this option, you would repay us for the advance in your future monthly payments. We will need the contact information for your insurance agent or company as well as the amount of the premium currently due. Insurance companies allow a very short time to reinstate policies that have expired and it is important that you call us immediately if you need our assistance. We cannot pay your voluntary hazard insurance premium without your cooperation.

    If you do not elect to establish an escrow account pursuant to the above paragraph for the continuation of your insurance policy, we will establish one in conjunction with the insurance we obtain and that escrow account will be charged for the premiums that we pay. **As a result, your monthly mortgage payments will be increased to include the cost of this policy.**

  - *Applicable to Escrow*
    If we purchase this insurance, your escrow account will be charged for the premiums that we pay. **Please be advised that your monthly mortgage payments will be increased to include the cost of this policy.**

- **THE INSURANCE WE OBTAIN:**

  - The insurance we obtain will remain in effect until you provide us with evidence of acceptable coverage, at which time the policy we obtained will be canceled, and you will receive a refund of any unearned premium.

    Even if you obtain coverage that is acceptable to us, please be aware that if there is a lapse between the cancellation of your insurance and the effective date of your new coverage, you will be charged for the coverage that we purchased to cover that lapse period.

  - **The cost of the insurance we obtain is likely to be much higher than the cost of coverage you could obtain on your own.** This is because the insurance we purchase is issued automatically without evaluating the risk of insuring your property.

  - **The hazard insurance we obtain will not cover any amount you feel your home is worth in excess of the amount of dwelling coverage that you previously obtained and we entered on our records.** If you have information to verify that the amount of coverage should be different please let us know, in writing, at the address in this notice. If we did not know the last amount of insurance coverage you obtained, we will purchase coverage in the amount of the unpaid principal balance of your loan. Although such coverage does not meet our property insurance requirements, we will purchase it as a default in the absence of information allowing for acceptable coverage for your property. We will charge the cost of such insurance to you as described in the "Escrowing for Insurance" paragraph above. This does not in any way relieve you of your obligation to provide insurance acceptable to us.



NMLS #: 1852
01 EXPIRED INS LTR 3     F 008

Valerie Marino

- **The hazard insurance we obtain will cover <u>only</u> the structure of your home** (e.g. the building, walls, floors, roof and permanent attachments).

  - It will <u>not</u> cover your furniture or any of your other personal belongings.
  - It will <u>not</u> cover the cost of temporarily living outside of your home because it was damaged and is being repaired.
  - It will <u>not</u> cover any liability incurred by you personally to someone who is injured while on your property.

- The policy we obtain will supersede any lender coverage remaining in effect under your previous policy. Obtaining your own insurance is in your best interest. You have the right to purchase your own insurance from the insurance company of your choice. If you do not have a current policy covering your property, please contact your agent or carrier and purchase coverage.

- **If we purchase insurance for you, an affiliate of OCWEN LOAN SERVICING, LLC may benefit.**

  We may incur expenses in placing this insurance policy. Such expenses are recoverable by us as stated in your mortgage documents and/or Deed of Trust. The insurance company may reimburse us for these expenses in conjunction with the placement of this hazard insurance, and may factor such reimbursement into the rate charged for the coverage.

- **IMPORTANT BANKRUPTCY INFORMATION:**

  - If you have filed for bankruptcy and your case is still active or if you have received an order of discharge, please be advised that this is not an attempt to collect a pre-petition and discharged debt. Any action taken by OCWEN LOAN SERVICING, LLC is for the sole purpose of protecting our lien interest in your property and not to recover any amounts from you personally. If you have surrendered the property during your bankruptcy case and you are no longer occupying the property, you may disregard this notice. **If you are represented by an attorney in a bankruptcy proceeding, you should review this notice and discuss any questions you may have regarding this notice with your attorney.**

- **FAIR DEBT COLLECTION PRACTICES ACT DISCLOSURE:**

  - OCWEN LOAN SERVICING, LLC is required by the Fair Debt Collection Practices Act to inform you that, as your loan servicer, we are attempting to collect a debt, and any information obtained will be used for that purpose. However, if you have received a discharge from bankruptcy, and the loan was not reaffirmed in the bankruptcy case, OCWEN LOAN SERVICING, LLC will only exercise its rights against the property and is not attempting any act to collect the discharged debt from you personally.

- **IMPORTANT STATE INFORMATION:**

  - Your state may offer a FAIR plan which may offer coverage on your property at a lower cost. Contact your state FAIR Plan association or Department of Insurance for additional details on FAIR plan coverage.

  - Please be advised that lender-placed carrier providing the coverage referenced above may be staffing our customer service telephone lines.

**WE HOPE YOU'LL AGREE THAT OBTAINING YOUR OWN INSURANCE IS IN YOUR BEST INTEREST.**



Ocwen Loan Servicing, LLC is a debt collector attempting to collect a debt and any information obtained will be used for that purpose.

If you have filed a bankruptcy case with respect to your obligation to Ocwen Loan Servicing, LLC, you should discuss this notice with your bankruptcy attorney. Whether or not you are liable for any sums advanced, will depend upon the type of bankruptcy which you have filed and whether you have reaffirmed your debt with Ocwen Loan Servicing, LLC.

NMLS #: 1852
01 EXPIRED INS LTR 3      F 008

Valerie Marino
Christopher Marino

## IMPORTANT NOTICE - PLEASE READ

**If you are unable to pay the premium for your voluntary homeowners, condominium unit owners, flood or wind insurance, we may be able to assist.**
**Please note this offer is not available on Home Equity Lines of Credit.**

If you wish to maintain your current voluntary insurance coverage or obtain/increase your own voluntary insurance coverage, but are unable to pay the premium, OCWEN LOAN SERVICING, LLC will advance the premium on your behalf. If necessary, OCWEN LOAN SERVICING, LLC will request that your insurance agent or company immediately reinstate your voluntary insurance coverage without lapse. OCWEN LOAN SERVICING, LLC will establish an escrow/impound account to collect for repayment of the advanced insurance premium, as well as all future insurance disbursements for all required insurance coverage.

By signing this form, you agree to the following terms:

- You agree to the establishment of an escrow/impound account.

- You agree to provide a copy of your insurance premium invoice for your voluntary insurance policy and you will notify your insurance agent or carrier that all future insurance premiums will be paid by OCWEN LOAN SERVICING, LLC.

- You agree to the repayment of the insurance premium advanced on your behalf to be collected by OCWEN LOAN SERVICING, LLC through the established escrow/impound account which will increase your total monthly payment.

- You agree to the repayment of all future required insurance premiums to be collected by OCWEN LOAN SERVICING, LLC through the established escrow/impound account and increase your total monthly payment.

- You agree that OCWEN LOAN SERVICING, LLC will manage your escrow/impound account in accordance with your loan documents as well as state and federal law.

**I/We, agree to the terms listed above and request that OCWEN LOAN SERVICING, LLC proceed with the payment of the insurance premium identified on the enclosed insurance premium invoice. I/We understand that every effort will be made to advance the insurance premium to the insurance agent or company designated on the premium invoice in a timely manner. OCWEN LOAN SERVICING, LLC is not liable for any failure of the insurer to receive or accept the premium or to reinstate the policy. In the event that the insurer fails to accept the premium and reinstate the policy, any refund of premium I/we receive will immediately be returned to OCWEN LOAN SERVICING, LLC to be credited to the escrow account.**

Signature: _____

Signature: _____

Date: _____

**Please immediately mail or fax the signed notice, along with a copy of your current insurance premium invoice, to the address or fax number listed below.**

OCWEN LOAN SERVICING, LLC
ITS SUCCESSORS AND/OR ASSIGNS
P.O. BOX 659826
SAN ANTONIO, TX 78265-9126
Fax Number: (866) 807-1814



NMLS #: 1852
01 EXPIRED INS LTR 3          F 008

OB0015   042301FBIND39914030104

Exhibit B

Exhibit B

Exhibit B

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEVADA (RENO)

|  |  |  |
|---|---|---|
| | . | Case No.  13-50461-BTB |
| IN RE: | . | |
| | . | Chapter 7 |
| CHRISTOPHER MICHAEL MARINO | . | |
| and VALERIE MARGARET MARINO, | . | 300 Booth Street |
| | . | Reno, NV 89509 |
| Debtors. | . | |
| | . | Thursday, February 25, 2016 |
| . . . . . . . . . . . . . . . | . | 10:05 a.m. |

TRANSCRIPT OF EVIDENTIARY HEARING RE: DOC# 27 MOTION TO REOPEN
CHAPTER 7 CASE UNDER 11 U.S.C. 350 AND F.R.B.P. 5010 TO HOLD
CREDITORS IN CONTEMPT AND FOR SANCTIONS FOR VIOLATION OF THE
DISCHARGE INJUNCTION 11 U.S.C. 524(A)(2). FEE AMOUNT 260.,
MOTION FOR CONTEMPT, MOTION FOR SANCTIONS FOR VIOLATION OF THE
DISCHARGE INJUNCTION FILED BY CHRISTOPHER PATRICK BURKE ON
BEHALF OF CHRISTOPHER MICHAEL MARINO, VALERIE MARGARET MARINO
BEFORE THE HONORABLE BRUCE T. BEESLEY
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtors:          CHRISTOPHER PATRICK BURKE, ESQ.
                          702 Plumas Street
                          Reno, NV 89509
                          (775) 333-9277

For Ocwen Loan
Servicing, LLC:           Wright, Finlay & Zak
                          By:  SEAN N. PAYNE, ESQ.
                          7785 West Sahara Avenue
                          Suite 200
                          Las Vegas, NV 89117
                          (702) 475-7964

Audio Operator:           Illuminada Starzyk, ECR

Transcription Company:    Access Transcripts, LLC
                          10110 Youngwood Lane
                          Fishers, IN 46038
                          (855) 873-2223
                          www.accesstranscripts.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

2

<u>I N D E X</u>
<u>2/25/16</u>

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| FOR DEBTORS: | | | | |
| Christopher Michael Marino | 7 | 54 | 76 | 80 |
| Bernadette O'Kane | 83 | -- | -- | -- |
| Valerie Marino | 145 | 156 | 160 | -- |
| | | | | |
| FOR THE LENDER: | | | | |
| Sony Prudent | 95 | 117 | 137 | 141 |

| EXHIBITS: | ADMITTED |
|---|---|
| Debtors' Exhibit 1 through 5 | 164 |
| Debtors' Exhibit 6, Pages 39 and 40 | 30/164 |
| Debtors' Exhibit 6-A through 6-W | 33 |
| Debtors' Exhibit 7, Pages 99 and 100 | 164 |
| Debtors' Exhibit 7, Pages 179 through 181 | 166 |
| Debtors' Exhibit 7, Pages 182 and 183 | 15/166 |
| Debtors' Exhibit 7, Pages 185 and 186 | 26 |
| Debtors' Exhibit 7, Pages 189 and 191 | 166 |
| Debtors' Exhibit 7, Pages 201 through 203 | 165 |
| Debtors' Exhibit 8 | 11 |
| Debtors' Exhibit 9 | 167 |

3

1          (Proceedings commence at 10:05 a.m.)

2               THE COURT:  Good morning.  Please be seated.  This is

3    the case of Christopher Michael Marino and Mrs. Marino.  The

4    main case is 13-50461.  I'm sorry, that's the adversary case,

5    and I don't have the main case number handy.  Appearances,

6    please.

7               MR. BURKE:  Good morning, Your Honor.  Christopher

8    Burke for the Marinos, who are present.

9               MR. PAYNE:  Good morning, Your Honor.  Sean Payne

10   appearing on behalf of the secured creditor, Ocwen.

11              THE COURT:  Okay.  I have a couple of questions and

12   comments before we start.  It appears to me, from having

13   reviewed your briefs and the cases and that sort of thing, that

14   there's really no question but that Ocwen, as the servicing

15   agent for Deutsche Bank, was aware of the bankruptcy, was aware

16   of the discharge, was aware that there had been a stay relief

17   granted, and that they sent the various letters that are

18   attached, so -- and that those are received by the plaintiffs

19   in this case.

20              If everybody is okay with that, I think we can --

21   I'll make that finding that all of those things occurred, and

22   you can get to what I think is the heart of the matter, which

23   is why did Ocwen send the letters.  Because as I understand the

24   burden of proof, it's necessary as Ocwen had to be aware of the

25   bankruptcy and the discharges, and they were.  What was their

O'Kane - Direct                              83

1         THE COURT:  Okay.

2         MR. BURKE:  Would the Court prefer --

3         THE COURT:  No, go ahead.  We'll --

4         Ma'am, could you please step forward.  Please step

5   forward and be sworn.  Here.

6         THE CLERK:  Please raise your right hand.

7          BERNADETTE O'KANE, DEBTORS' WITNESS, SWORN

8         THE CLERK:  Okay, thank you.  Have a seat there,

9   please.

10        THE COURT:  Please have a seat.  There's some water

11  here for you.  And if you need to take a break for any reason,

12  please let me know, and we'll take a break.  Please state your

13  full name.

14        THE WITNESS:  Bernadette O'Kane.

15        THE COURT:  You might want to move closer to that, I

16  think.  You have kind of a soft voice.

17        THE WITNESS:  Okay.

18        THE COURT:  Thank you.

19                      DIRECT EXAMINATION

20  BY MR. BURKE:

21  Q    Ms. O'Kane, are you familiar with the Marinos?

22  A    Yes.

23  Q    How long have you known them?

24  A    I would say about eight years.

25  Q    When did you first meet them?

ACCESS TRANSCRIPTS, LLC           1-855-USE-ACCESS (873-2223)

O'Kane - Direct                        90

1  Q    Were they able to move on, to your knowledge?

2  A    No.

3  Q    Why not?

4  A    Because the calls did not stop.

5  Q    What calls?

6  A    The calls from the lending institutions that, I guess,

7  financed the home or whatever.

8  Q    How do you know she received -- or who received calls?

9  A    Mainly Val.

10  Q    And how do you know she received calls?

11  A    I know because we were friends, and if I was at her house

12  and my phone was ringing, I'd say, Val, pick that up for me, or

13  if her phone was ringing, she'd say, Bernie, can you get that

14  for me.  And I would pick -- I'd answer her phone, she'd answer

15  my phone.  We're friends.  Friends do that kind of thing.  And

16  on several occasions, she would pick up the phone, and I would

17  hear her.  And first of all, I could hear her saying, we filed

18  a bankruptcy, this is done, please don't call me anymore.  And

19  then, sure enough, she'd get another call, and Val would be

20  just standing there crying and looking at her phone and saying,

21  I don't even want to have a phone anymore.  She was so

22  distraught over these phone calls.

23  Q    Did you ever pick up her phone and receive a call from her

24  mortgage company?

25  A    Yes, I did.

O'Kane - Direct                          91

1  Q    How many times?

2  A    Several times.  To say an exact number, I can't, but

3  several times.

4  Q    And what would they say when you picked up the phone?

5  A    First, they would ask me when I intended to pay the debt.

6  Q    And you weren't even the debtor.

7  A    No.  I was not Val, and the assumption was that because I

8  answered that phone, that I was Val.

9  Q    What did you respond?

10 A    I would -- I let them talk, and then I'd say, I'm sorry,

11 but I'm not Valerie.

12 Q    And what did they say throughout the conversation that you

13 recall?

14 A    They just continued to ask me to pay.

15 Q    They said you basically need to pay on this loan?

16 A    Yes.

17 Q    Okay.  When -- and this is after the discharge?

18 A    Correct.

19 Q    Okay.  So there was a time when Ms. Marino was really

20 upset.  Then, she filed a bankruptcy, calmed down, and then it

21 seemed like these phone calls started.  How did you -- describe

22 her at that point.

23 A    Val was -- you could see she looked ill.  She didn't look

24 well.  She had these pains in her stomach.  And at one point,

25 the pains were so severe that she thought she had stomach



ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

94

1  this hearing is going to go, I'd request that we have the

2  ability to put our witness on the stand and get his testimony.

3          MR. BURKE:  No objection.

4          THE COURT:  Go ahead.

5          MR. PAYNE:  Mr. Prudent, please take the stand.

6          THE CLERK:  Please raise your right hand.

7            SONY PRUDENT, LENDER'S WITNESS, SWORN

8          THE CLERK:  Please have a seat.

9          THE COURT:  Hi.  We have some water here for you, and

10 if you need to take a break for any reason, let us know -- let

11 me know.

12         THE WITNESS:  Thank you, Your Honor.

13         THE COURT:  Thank you.  Could you please state your

14 full name.

15         THE WITNESS:  Sony Prudent.

16         THE COURT:  S-O-N-Y?

17         THE WITNESS:  Yes.

18         THE COURT:  And could you spell your last name?

19         MR. PAYNE:  Apologize, Your Honor, getting my --

20         THE WITNESS:  P-R-U-D-E-N-T.

21         THE COURT:  Prudent.

22         THE WITNESS:  Yes, Your Honor.

23         THE COURT:  Good last name for a banker.

24         THE WITNESS:  Thank you, Your Honor.

25                    DIRECT EXAMINATION



Prudent - Direct                    101

1  for the bankruptcy department.

2  Q    Did you review those policies and procedures before coming

3  here for this hearing today?

4  A    Yes.

5  Q    Thank you.

6         THE COURT:  So let me make sure.  You're trained in

7  how the bankruptcy department operates?

8         THE WITNESS:  We're trained in their procedures, as

9  well as reviewing.  There is a portal with all of the policies

10 and procedures for different departments.

11        THE COURT:  And do you work in the bankruptcy

12 department?

13        THE WITNESS:  No, I work in the legal department.

14        THE COURT:  Okay.

15 BY MR. PAYNE:

16 Q    Have you had history of working in the servicing -- or in

17 a bankruptcy servicing department in the past?

18 A    No.

19        THE COURT:  I'm going to overrule your objection.  I

20 -- there may be an issue as to how qualified he is, but I think

21 he can testify to it, and you can discover that on cross.

22        MR. BURKE:  Thank you.

23 BY MR. PAYNE:

24 Q    So, Mr. Prudent, I'm going to revisit.  Can you identify

25 reasons or occasions where notices would be sent after the flag

Prudent - Direct                                    102

1  is raised in the system that bankruptcy has been filed and a

2  discharge has been entered?

3  A    They would be sent pursuant to federal regulation, state

4  regulation, as well as per the deed of trust.

5  Q    Are these notices not intended to collect on the debt when

6  they're being sent?

7  A    There would be a disclaimer that there's no -- bankruptcy

8  disclaimer, letting them know that this is not an attempt to

9  collect a debt, if you've been discharged or in active

10 bankruptcy.  It's for informational purposes for the account

11 and to be in compliance with the laws that are required for

12 loan servicing.

13 Q    If the bankruptcy flag was not raised in your system,

14 would that disclaimer appear on your regular account statements

15 and notices?

16 A    You're saying -- are we saying active bankruptcy or --

17 Q    Active bankruptcy, correct.

18        THE COURT:  What's the difference between an active

19 bankruptcy and something that's not an active bankruptcy?

20        THE WITNESS:  Active bankruptcy is -- would be a BK

21 flag, letting us know that the bankruptcy is still active.  BKC

22 [sic] says that the bankruptcy has been discharged.

23        THE COURT:  Okay.  And BKC [sic] is not an active

24 bankruptcy?

25        THE WITNESS:  No, the bankruptcy has been discharged.

Prudent - Direct                        110

1  regarding insurance on the property after the discharge and

2  judgment has been entered?

3  A    Because the insurance is still required on the property,

4  again, to protect the lien and security interest per the deed

5  of trust.

6           MR. BURKE:  Objection.  Calls for legal conclusion.

7           THE COURT:  Sustained.

8           I have a question for you.  Why would you be

9  notifying the debtor, who you knew was not occupying the

10 property, that they had to pay hazard insurance?

11          THE WITNESS:  It's still required by law to --

12          MR. BURKE:  Objection.  Calls for a legal conclusion.

13          THE COURT:  Just as a practical matter.

14          THE WITNESS:  It's a practical matter to be in

15 compliance with the -- our -- all of our regulators and the

16 requirements for mortgage servicing.

17          MR. BURKE:  Continuing objection.

18          MR. PAYNE:  Your Honor, he's describing the policies

19 and procedures for --

20          THE COURT:  I understand.  And if you can tell me

21 this is a practical matter, it does not make sense to me that a

22 company would send out a letter saying you, the debtor, have to

23 pay for the insurance that we put on the property when you

24 know, based on your prior correspondence, that they had not

25 occupied that property for at least nine months.

Prudent - Cross                         126

1  Your Honor.

2              THE COURT:  Is there a state agency that requires

3  this notices?

4              THE WITNESS:  I'm not familiar with all the law, so I

5  can't say the exact --

6              THE COURT:  So it is your internal policy which is

7  causing these to be sent.

8              THE WITNESS:  Some letters are for internal policies.

9  Others are for RESPA or to comply with state guidelines.

10             THE COURT:  Okay.  But this one, as far as you know,

11 is just internal.

12             THE WITNESS:  It could be internal or it could be

13 state law, but I'm sure.

14             THE COURT:  But you don't know, you just don't know.

15             THE WITNESS:  Correct, Your Honor.

16             THE COURT:  I'm asking -- you just don't know, I'm

17 just asking.

18             THE COURT:  I don't know.

19             THE COURT:  Okay.  Thank you.

20             MR. BURKE:  Thank you.

21 BY MR. BURKE:

22 Q    If you turn to page 92, would you read the third sentence?

23 "We understand."  Oh, first, what is the date on this letter?

24 A    It is May 9th, 2014.

25 Q    Okay.  Now, that's almost a year after the discharge and

ACCESS TRANSCRIPTS, LLC        ⚖        1-855-USE-ACCESS (873-2223)

V. Marino - Direct                    150

1  Q    Okay.  So after a while, you knew their number.

2  A    I did know their number, yes.  That's how often they were

3  calling.

4  Q    Okay.  I don't want to go -- it sounds like you got

5  anywhere from 60 to 100 calls.  Does that sound --

6  A    It was a lot of calls, yes.

7  Q    Okay.  I don't want to go through each one.  Can you

8  describe to the Court a particular instance of a call that

9  really affected you?

10 A    Well, there was one where Chris and I were out on our

11 patio, and the phone rang, and I said, it's Ocwen.

12       And Chris said to me, answer the phone, tell them that

13 they have to contact our lawyer, and then give them Chris

14 Burke's number.

15       And I said, I don't want to answer the phone.  I said, I

16 can't deal with this anymore, I just can't do it.  Excuse me.

17 So Chris started yelling at me to answer the phone, and I said,

18 I can't answer the phone, Chris, I don't want to deal with them

19 anymore.

20       And he said, answer the phone and tell them to stop

21 calling this number, and tell them to call Chris Burke; that's

22 what Chris Burke has instructed us to do; it's supposed to be

23 said and done, we're discharged; that's it.

24       So I answered the phone, and they said it was an attempt

25 to collect a debt, and I gave them the information.  And then I

V. Marino - Direct                    151

1  got off the phone, and finally I said to the person, you've got

2  to stop calling this number; I don't even know how you got this

3  number; I want you to stop calling this number; I've given you

4  the information I'm require to give you; stop trying to call me

5  to collect money on this loan.

6      So I got off the phone, and Chris said, why didn't you say

7  this and why didn't you say -- because he was like -- he said,

8  you should have asked to speak to their supervisor.

9      I said, Chris, I just -- I can't deal with this anymore;

10 they're calling my number; I don't want to deal with this

11 anymore.  So we got in a huge fight, and it was the same old

12 thing over and over again with our marriage, and I just

13 couldn't deal with it anymore.

14     And I thought because -- with the bankruptcy, that this

15 would all be said and done.  I was told that and I thought it

16 would be done, and it wasn't done.  And it kept on going on.

17 It was just every -- all the time, constant.  And I was at

18 work, and I'd say to my boss, it's -- I got two more phone

19 calls; look at this, there's two more phone calls, you know.

20     And she said, well, haven't you told them to stop calling?

21 Yes, I have, you know.  Yeah.

22 Q    And did they say they were from Ocwen?

23 A    Yes.

24 Q    And they said they were trying to collect a debt?

25 A    Yes.

V. Marino - Direct                              152

1  Q    Did they say anything, well, we knew you were in

2  bankruptcy so you don't have to pay?

3  A    No.  They never said that, ever.

4  Q    Did they say this is for informational purposes?

5  A    No, they did not.

6  Q    You've just described one phone call.  How many times

7  would you say out of their phone calls that you did answer, and

8  how many didn't you?

9  A    I don't know, I probably answered maybe a handful of phone

10  calls, probably maybe -- it's hard to think of a number in that

11  time.  I mean, 20, I don't know.  It seems to me that after a

12  while, I was just -- I couldn't take it anymore.  I just

13  couldn't take it anymore.  It was like I overwhelmed by it.  I

14  mean, It was affecting me in every way, so I couldn't do it.

15  Q    What way did it affect you?

16  A    I was getting stomach aches and I could sleep, and I was

17  fighting with Chris, and I was -- I was a nervous wreck.  I was

18  just a nervous wreck.

19  Q    Tell me about your stomach aches.  Did you have any prior

20  stomach problems?

21  A    No.

22  Q    And when did the stomach problems start?

23  A    Well, they started basically when we were trying to modify

24  the loan with Ocwen.  And they just -- it was so inept, and

25  they were so inept that I -- we couldn't get anywhere with

173

1              **C E R T I F I C A T I O N**

2

3        I, Ilene Watson, court-approved transcriber, hereby

4  certify that the foregoing is a correct transcript from the

5  official electronic sound recording of the proceedings in the

6  above-entitled matter.

7

8

9

10  ILENE WATSON, AAERT NO. 447    DATE:  June 30, 2016

11  ACCESS TRANSCRIPTS, LLC

12

13

14

15              **C E R T I F I C A T I O N**

16

17        I, Lisa Luciano, court-approved transcriber, hereby

18  certify that the foregoing is a correct transcript from the

19  official electronic sound recording of the proceedings in the

20  above-entitled matter.

21

22

23

24  LISA LUCIANO, AAERT NO. 327    DATE:  June 30, 2016

25  ACCESS TRANSCRIPTS, LLC

<u>Exhibit C</u>

<u>Exhibit C</u>

<u>Exhibit C</u>

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEVADA (RENO)

|  |  |  |
|---|---|---|
| | . | Case No.  13-50461-BTB |
| IN RE: | . | |
| | . | Chapter 7 |
| CHRISTOPHER MICHAEL MARINO | . | |
| and VALERIE MARGARET MARINO, | . | 300 Booth Street |
| | . | Reno, NV 89509 |
| Debtors. | . | |
| | . | Monday, June 20, 2016 |
| . . . . . . . . . . . . . . . | . | 3:04 p.m. |

TRANSCRIPT OF JUDGES RULING RE:  DOC# 27 MOTION TO REOPEN
CHAPTER 7 CASE UNDER 11 U.S.C. 350 AND F.R.B.P. 5010 TO HOLD
CREDITORS IN CONTEMPT AND FOR SANCTIONS FOR VIOLATION OF THE
DISCHARGE INJUNCTION 11 U.S.C. 524(a)(2). FEE AMOUNT 260.,
MOTION FOR CONTEMPT, MOTION FOR SANCTIONS FOR VIOLATION OF THE
DISCHARGE INJUNCTION FILED BY CHRISTOPHER PATRICK BURKE ON
BEHALF OF CHRISTOPHER MICHAEL MARINO, VALERIE MARGARET MARINO
**BEFORE THE HONORABLE BRUCE T. BEESLEY**
**UNITED STATES BANKRUPTCY COURT JUDGE**

TELEPHONIC APPEARANCES:

For the Debtors:          CHRISTOPHER PATRICK BURKE, ESQ.
                          702 Plumas Street
                          Reno, NV 89509
                          (775) 333-9277

For Ocwen Loan
Servicing, LLC:           Wright, Finlay & Zak
                          By:  SEAN N. PAYNE, ESQ.
                          7785 West Sahara Avenue
                          Suite 200
                          Las Vegas, NV 89117
                          (702) 475-7964

Audio Operator:           Stacie C. Burney, ECR

Transcription Company:    Access Transcripts, LLC
                          10110 Youngwood Lane
                          Fishers, IN 46038
                          (855) 873-2223
                          www.accesstranscripts.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

2

1       (Proceedings commence at 3:04 p.m.)

2           THE COURT:  Christopher and Valerie Marino, Case

3   Number 13-50461.

4           Appearances, please.

5           MR. BURKE:  (Telephonically)  Christopher Burke for

6   the Marinos.

7           MR. PAYNE:  (Telephonically)  Good afternoon, Your

8   Honor.  Sean Payne for the creditor.

9           THE COURT:  Thank you.  I apologize this took me so

10  long to get to this, but this was the best briefing I've seen

11  on one of these hearings, and the best representations,

12  actually, so it took a little more time than particularly

13  unopposed ones.  But that's my excuse for taking so long to do

14  this.

15          But let me tell you what I've looked through.  I've

16  gone -- in the process of preparing for this and I went back

17  and read through all of the pleadings, initially, and all the

18  oppositions and including the supplemental pleadings that were

19  filed after the hearing.  I've looked through all of the

20  exhibits which were admitted in the court.  I've gone through

21  the transcript of the proceedings.

22          I've also looked at each of the cited references for

23  the -- that the defendant used to support the filing of certain

24  -- sending of certain letters.  So those include 12 C.F.R.

25  Section 1024.37(c), California Civil Code 2924.9, 12 U.S.C.

7

1  time practitioner in California and also a judge.  And what he

2  found was that while the notices, if each one were taken

3  individually, probably are innocuous, but when you have a

4  series of notices over a long period of time, particularly

5  where you have the debtor having received a discharge and at

6  some point the debtor having vacated the house, that there --

7  they cannot really be trying to notify the debtors of certain

8  things, because the debtor's given up the house.  They

9  indicated they would abandon the house, they left the house.

10         Ocwen could not have been doing anything but trying

11  to get the debtor to give them some more money, either for

12  insurance or agree to be responsible for the house that was

13  vacant, even after they had -- even after Ocwen had -- received

14  stay relief.  I think that Ocwen, rather than foreclose on the

15  property, which they could have done approximately six -- well,

16  approximately three months after the case was filed, waited two

17  years to foreclose, hoping that if they sent enough letters and

18  gave enough calls, that the debtor would ultimately pay them

19  some money for something.  That's all I can think.

20         They talk about, you know, "if you have filed

21  bankruptcy."  Well, they knew the debtor had filed bankruptcy

22  because they got the notice of the bankruptcy filing.  They

23  talk about "if you have received a discharge."  Well, they knew

24  that the debtor had received a discharge.  I don't think Ocwen,

25  or any creditor, is allowed, when they knew that the debtor has

11

1    calls are you specifically finding in your findings of fact?

2            THE COURT:  A hundred phone calls and -- I'm finding

3    18 letters.  One was -- one of the letters wasn't from this

4    case, one of the letters was an inaccurate letter saying the

5    house has been paid off, and another one was a letter saying --

6    actually, 19 letters.  Because the letter saying --

7            MR. PAYNE:  Nineteen letters and 100 phone calls?

8            THE COURT:  Yeah.  The one that said -- Exhibit G,

9    the one that said the loan was paid in full, I don't think was

10   -- I think it was just an error.

11           MR. PAYNE:  Okay.  Thank you, Your Honor.

12           THE COURT:  Thank you.

13           MR. BURKE:  Thank you.

14           THE COURT:  We'll be in recess.

15       (Proceedings concluded at 3:25 p.m.)

16                       *  *  *  *  *

17

18

19

20

21

22

23

24

25

12

1        **C E R T I F I C A T I O N**

2

3            I, Lisa Luciano, court-approved transcriber, hereby

4   certify that the foregoing is a correct transcript from the

5   official electronic sound recording of the proceedings in the

6   above-entitled matter.

7

8

9   _____

10  LISA LUCIANO, AAERT NO. 327      DATE:   June 30, 2016

11  ACCESS TRANSCRIPTS, LLC

12

13

14

15

16

17

18

19

20

21

22

23

24

25

